[Cite as *State v. Collins*, 2024-Ohio-5112.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                              :       APPEAL NO.   C-240011
                                                    TRIAL NO.     B-2004916
    Plaintiff-Appellee,              :

                                            :       *O P I N I O N.*

  vs.                                        :

                                            :

REGINA COLLINS,                             :

    Defendant-Appellant.             :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Conviction Affirmed as Modified, Sentence Vacated, and Cause Remanded.

Date of Judgment Entry on Appeal: October 25, 2024


*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Stephanie N. Lape,* for Defendant-Appellant.

**CROUSE, Judge.**

{¶1}   Harrell Collins Sr. ("Harrell Sr.") gave his daughter, defendant-appellant Regina Collins ("Regina"),[1] his power of attorney to make decisions related to his property. The State indicted Regina for using some of Harrell Sr.'s property beyond the scope of his consent, alleging that she had spent his social security and pension payments on her own personal expenses and gambling, rather than on Harrell Sr.'s nursing home bills. Regina was convicted of third-degree felony theft from a person in a protected class and ordered to pay restitution to the nursing homes. Regina now appeals, arguing (1) that the State's evidence was insufficient, (2) that her conviction was against the manifest weight of the evidence, (3) that the nursing homes were not entitled to restitution, and (4) that her trial counsel was ineffective. As we explain below, Regina is partially correct: the State's evidence was sufficient only to convict Regina of a lesser-included degree of theft, and the nursing homes are not "victims" entitled to restitution. We therefore modify Regina's conviction, vacate her sentence and restitution order, and remand this cause to the trial court for resentencing on the modified conviction.

## I. BACKGROUND

{¶2}   Regina moved in with her parents in 1993 to help care for her elderly grandmother. After Regina's grandmother and mother passed away, she continued to live with her father, Harrell Sr., as roommates. During their time together, Regina and Harrell Sr. would often go to the casino. In 2016, Harrell Sr. gave Regina his medical and general power of attorney.

---

[1] Because this case involves several members of the Collins family, all of whom share a last name, this opinion will refer to the various family members by their first names.

2

{¶3} From March 8, 2018, until his death in July 2020, Harrell Sr. resided in long-term nursing care, first at Premier Estates of Three Rivers ("Premier Estates"), and later at Batavia Healthcare Center ("Batavia Healthcare"). During that time, Harrell Sr. had a tracheotomy and was on a ventilator. As a result, Harrell Sr. was unable to speak.

{¶4} Harrell Sr. received income from social security and payments from his late wife's pension. Harrell Sr.'s social security payments were deposited into a U.S. Bank account, which he held jointly with Regina. The U.S. Bank account was closed at the end of February 2018. The pension payments were deposited into a Chase Bank account, which was held solely in Regina's name and remained open at the end of the period listed in the indictment. Regina routinely withdrew the payments made into these accounts as soon as they were deposited. She claimed these immediate withdrawals were necessary because Harrell Sr. was susceptible to being the victim of various financial scams.

{¶5} During Harrell Sr.'s time at the nursing homes, Regina was responsible for his finances under his power of attorney. Regina routinely argued with the nursing homes about the amounts due and refused payment because, she claimed, Harrell Sr. was not receiving adequate care. Regina claims that she made complaints to various government agencies about the unacceptable care provided by the nursing homes. At trial, representatives of Premier Estates and Batavia Healthcare testified that Harrell Sr. owed $9,275.12 and $6,500 to the two facilities, respectively.

{¶6} Because of Harrell Sr.'s nonpayment, a representative from Premier Estates filed a complaint with the Medicaid Fraud Control Unit of the Ohio Attorney General's Office ("OAG"). An investigator from the OAG eventually reviewed

3

statements from the bank accounts into which Harrell Sr.'s funds were deposited and found that between August 2016 and November 2019, a total of $48,045.48 in social security and pension payments had been removed. The investigator attributed these withdrawals to Regina.

{¶7} Regina was indicted on one count of theft from a person in a protected class in violation of R.C. 2913.02(A)(2) and one count of unauthorized use of property in violation of R.C. 2913.04. Relying upon the $48,045.48 figure provided by the OAG, both crimes were charged as second-degree felonies. The period charged in the indictment ran from August 1, 2016, to November 19, 2019.

{¶8} Following a bench trial, Regina was convicted of theft from a person in a protected class, but was found not guilty of unauthorized use of property. Many of the suspect withdrawals had been in cash, however, and the trial court could not determine what that cash had been used for. The trial court nevertheless found that Regina "had no consent, implied or otherwise, to use her father's property for her own benefit to the exclusion of paying his most basic bills." On this theory, the trial court found that the State had proven that Regina stole $15,775.12—the amount of Harrell Sr.'s unpaid medical bills—but not all $48,045.48 charged in the indictment. The decrease in the value of property stolen resulted in a correlate drop in the degree of Regina's theft conviction from a second-degree felony to a third-degree felony. Regina was sentenced to three years of community control and ordered to pay restitution in the amount of $8,050 to Premier Estates and $5,136.73 to Batavia Healthcare. This timely appeal followed.

## II. ANALYSIS

{¶9} On appeal, Regina raises four assignments of error. The first two contend that the evidence supporting her conviction was insufficient, and that the conviction was against the manifest weight of the evidence, respectively. The third assignment of error contends that the nursing homes were not "victims" under Ohio law, and the trial court therefore erred in ordering Regina to pay them restitution. And in her fourth assignment of error, Regina asserts that her trial counsel was ineffective for failing to introduce certain evidence and make certain objections. We will address each assignment of error in the order presented.

### A. Sufficiency & Manifest Weight of the Evidence

{¶10} In her first assignment of error, Regina challenges the legal sufficiency of the evidence against her. In her second, she argues that her conviction was against the manifest weight of the evidence. Because these assignments of error both relate to the evidence used to convict Regina, we consider them together.

{¶11} When reviewing the sufficiency of the evidence, an appellate court asks whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *State v. Jones*, 2021-Ohio-3311, ¶ 16. Essentially, the court "asks whether the evidence against a defendant, *if believed*, supports the conviction." (Emphasis sic.) *Id.*

{¶12} In reviewing whether a conviction runs counter to the manifest weight of the evidence, we sit as a "thirteenth juror who may disagree with the factfinder's resolution of the conflicting evidence." (Cleaned up.) *State v. Martin*, 2022-Ohio-4175, ¶ 26. To do so, we "must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of all the witnesses," then

"decide whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed" and a new trial ordered. (Cleaned up.) *State v. McKelton*, 2016-Ohio-5735, ¶ 328, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶13}  Regina was convicted of theft from a person in a protected class in violation of R.C. 2913.02(A)(2). The relevant provision states that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services . . . [b]eyond the scope of the express or implied consent of the owner or person authorized to give consent." R.C. 2913.02(A)(2). If property was so taken, and if the victim of the theft was a member of a protected class, R.C. 2913.02(B)(3) dictates the level of the offense based on the value of the stolen property. Relevant here, (B)(3) makes theft from a person in a protected class a second-degree felony if the property was worth between $37,500 and $149,999.99, a third-degree felony if it was worth between $7,500 and $37,499.99, and a fourth-degree felony if it was worth between $1,000 and $7,499.99. The trial court ultimately found Regina guilty of third-degree felony theft from a person in a protected class.

{¶14}  Regina's sufficiency and weight arguments rest on two contentions: (1) that the State did not actually *prove* the amount of money she stole from Harrell Sr., instead using the amounts due to the nursing homes as a proxy for the value stolen; and (2) that, based on the broad powers conferred on Regina by Harrell Sr.'s power of attorney, the State failed to prove that Regina's use of the funds exceeded the scope of Harrell Sr.'s consent. To determine whether either argument has merit, we must first address the scope of Harrell Sr.'s consent in his power of attorney.

6

**{¶15}** "A power of attorney is a written instrument authorizing an agent to perform specific acts on behalf of the principal." *MacEwen v. Jordan*, 2003-Ohio-1547, ¶ 10 (1st Dist.); *accord* R.C. 1337.22(G). Since 2012, powers of attorney in Ohio have been governed by the Uniform Power of Attorney Act ("UPOAA"), R.C. 1337.21-64, as supplemented by those traditional "principles of law and equity" that the statute did not displace. R.C. 1337.39.

**{¶16}** To create a power of attorney, the principal must select an agent to act in their stead—traditionally called an "attorney in fact," *see* R.C. 1337.22(A)—who accepts that authority by exercising it. R.C. 1337.33. Upon acceptance, the agent assumes a nonwaivable duty to "[a]ct only within the scope of authority granted in the power of attorney." R.C. 1337.34(A)(3). When that instrument gives the agent "general authority" with respect to a matter or subject, the agent may exercise the powers described for that matter or subject in R.C. 1337.45-58, unless otherwise stated in the power of attorney. R.C. 1337.43. And a grant of authority "to do all acts that a principal could do" (or of similar import) confers upon the agent the general authority described above as to *all* subjects and matters described in R.C. 1337.45-57. R.C. 1337.42(C).

**{¶17}** Such a grant of broad general authority, however, does *not* include the authority to make gifts, which is described in R.C. 1337.58. The authority to "make a gift" is one of the powers that an agent must be *expressly* granted. R.C. 1337.42(A)(2); *accord MacEwen* at ¶ 12 (holding, pre-UPOAA, that an agent "may not make gratuitous transfers of the principal's assets unless the power of attorney from which the authority is derived expressly and unambiguously grants the authority to do so"). And even if an agent is given the authority to make gifts, she may not use that authority to "create in [herself], or in an individual to whom [she] owes a legal obligation of

support, an interest in the principal's property," unless the agent is "an ancestor, spouse, or descendant" of the principal. R.C. 1337.42(B).

**{¶18}** An agent appointed under a power of attorney "has a fiduciary relationship with the principal." *MacEwen,* 2003-Ohio-1547, at ¶ 10 (1st Dist.). The UPOAA codifies many of the traditional duties of a fiduciary, including duties of loyalty and good faith, the duty to keep records, and the duty to avoid conflicts of interest. R.C. 1337.34(A) and (B); *see* Andrew H. Hook & Lisa V. Johnson, *The Uniform Power of Attorney Act*, 45 Real Property, Trust & Estate L.J. 283, 296-297 (2010).[2] With respect to gifts, R.C. 1337.58 specifies that an agent empowered to make a gift may only do so as she "determines is consistent with the principal's objectives if actually known by the agent and, if unknown, as the agent determines is consistent with the principal's best interest based on all relevant factors," including

(1) The value and nature of the principal's property;

(2) The principal's foreseeable obligations and need for maintenance;

(3) Minimization of taxes, including income, estate, inheritance, generation-skipping transfer, and gift taxes;

(4) Eligibility for a benefit, a program, or assistance under a statute or regulation;

(5) The principal's personal history of making or joining in making gifts.

R.C. 1337.58(C).

**{¶19}** While the UPOAA prescribes numerous civil remedies for an agent's breach of duty, those remedies are not exclusive. R.C. 1337.41. An agent's liability

---

[2] Available at https://www.americanbar.org/content/dam/aba/publications/real_property_trust_and_estate_law_journal/v45/rpte-journal-v45-2-article-hook-johnson.pdf.

under R.C. 1337.37 does not "limit the agent's liability to [those] amounts," and where a state "has enacted separate statutes to deal with financial abuse, an agent may face additional civil or criminal liability." Uniform Power of Attorney Act, section 117, comment (Uniform Law Comm. 2006);[3] *accord* Hook & Johnson at 300. Ohio's theft statute imposes just such criminal liability in its use-beyond-consent provision, R.C. 2913.02(A)(2). Prior to the UPOAA's passage, for example, the Eleventh District affirmed the conviction of an agent under R.C. 2913.02(A)(2) for giving herself an unauthorized gift under a power of attorney. *State v. Hanusosky*, 2009-Ohio-3409, ¶ 65 (11th Dist.).

**{¶20}** To assess whether the trial court could find Regina guilty of theft, therefore, we must ask two questions: (1) what was the scope of Regina's authority to dispose of the funds under Harrell Sr.'s power of attorney, and (2) based on the State's evidence, what portion of Harrell Sr.'s property did Regina "knowingly obtain or exert control over" to spend beyond the scope of that authorization? The State's theory, below and in its briefs, was that Regina used her father's funds for her own, personal benefit—including to fund her gambling activities. In other words, the State contends that Regina made a series of unauthorized self-gifts beyond the scope authorized in Harrell Sr.'s power of attorney.

### 1. *What Did the Power of Attorney Authorize?*

**{¶21}** The text of Harrell Sr.'s power of attorney was taken from the statutory form in R.C. 1337.60. Neither the statutory form nor the particular instrument in this case included an express and unambiguous grant of authority for the agent to make

---

[3] Available at https://www.uniformlaws.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=035bcb2c-b21c-e96d-f80f-5bfa14c2d604.

gifts, as required by R.C. 1337.42(A)(2). The section entitled "GRANT OF GENERAL AUTHORITY" gave Regina "general authority to act for" Harrell Sr. with respect to all the listed classes of assets, but did not contain any provision expressly conferring the power to give gifts. The "LIMITATION ON AGENT'S AUTHORITY" section merely restated R.C. 1337.42(B)'s proviso that an agent may not engage in self-dealing unless they are an "ancestor, spouse, or descendant" or unless otherwise specified. Finally, the "SPECIAL INSTRUCTIONS" section of Harrell Sr.'s power of attorney, left blank in the statutory form, contained only the handwritten words "No Limitations."

{¶22} This instrument clearly conferred upon Regina broad, general authority to dispose of Harrell Sr.'s assets. It even permitted Regina to engage in some measure of self-dealing while doing so, both because she was a "descendant[]" and because Harrell Sr.'s "No Limitations" instruction rejected the default rule. If the power of attorney gave Regina the authority to make a gift of Harrell Sr.'s property, then, it would also have given her the power to make such a gift to herself. But no provision in the instrument—not even the "no limitations" instruction—contained the sort of specific and express language that R.C. 1337.42(B) and this court require to authorize an agent to make gratuitous transfers. *See MacEwen*, 2003-Ohio-1547, at ¶ 12 (1st Dist.) (requiring principal to "expressly and unambiguously grant[] the authority" to make gifts). Under settled law, therefore, Harrell Sr.'s power of attorney did not give Regina the power to make a gift of Harrell Sr.'s property—either to herself or anyone else.

{¶23} This conclusion is strengthened by the preamble language contained in Ohio's statutory form, R.C. 1337.60. The form reminds the signatory that, "[u]nless expressly authorized and initialed by me in the Special Instructions, this power of

attorney does not grant authority to my agent to . . . [m]ake a gift." Although the signed power of attorney form introduced into evidence generally followed the statutory language, it did not contain this reminder.[4] Nevertheless, the statutory reminder illustrates that nothing in the statutory form covered gifts, and that the uninitialed "no limitations" instruction would not have been adequate to do so.

{¶24} But even if Harrell Sr.'s power of attorney *had* authorized Regina to give herself a gift from Harrell Sr.'s property, that authority would have been circumscribed by R.C. 1337.58. That provision, which limits the powers conferred under a general grant of authority to make gifts, would have permitted Regina to gift herself Harrell Sr.'s property only if she determined that such a gift was "consistent with [Harrell Sr.'s] objectives." R.C. 1337.58(C). If she did not "actually know[]" her father's objectives, then Regina could make the gift only if doing so was consistent with his best interest, considering, inter alia, his "foreseeable obligations and need for maintenance." R.C. 1337.58(C)(2).

{¶25} Given the statutory requirements and this court's precedent, the State's evidence, which included the power of attorney form, was sufficient for the trial court to find that Harrell Sr. "did not grant express consent nor did he grant implied consent for [Regina] to use all of his property for her benefit to the exclusion of paying the bills that went to his care." Based on this finding, any funds that Regina spent or withdrew as a gift for her own benefit were "beyond the scope of the express or implied consent of" Harrell Sr.—*at least* while medical bills remained unpaid. R.C. 2913.02(A)(2).

---

[4] Harrell Sr.'s signed power of attorney form, which was introduced as State's Exhibit 1 at trial, included a photocopy of Regina's license on an unnumbered initial page, followed by a page containing part of the statutory form and labeled at the bottom with the text "Page 2." It is unclear whether there had been a different "Page 1," or whether the page containing Regina's license had always been "Page 1."

*2.  Which Funds Were Misappropriated?*

**{¶26}**  The problem comes in determining *which* funds Regina did or did not dispose of as a gift. The State, in its bill of particulars and at trial, took the position that all of the pension and social security payments that had been deposited into Harrell Sr.'s accounts were withdrawn by Regina and spent beyond the scope of authorization. The trial court took a more conservative tack, finding that Regina only misappropriated the amount of funds owed and not paid for Harrell Sr.'s nursing-home care ($15,775.12).

**{¶27}**  But the State did *not* prove that Regina had misappropriated a sum of $15,775, only that she had failed to pay that much. As Regina points out, Harrell Sr.'s power of attorney granted her broad authority to spend Harrell Sr.'s money on his behalf. Harrell Sr. could conceivably have benefitted from expenditures *other than* payment of his nursing-home bills. Even payments for cell phone bills, dry cleaning, and gasoline could conceivably have been for Harrell Sr.'s benefit, if, in good faith, Regina deemed them necessary to facilitate his care. And Regina was free to reimburse herself for these and similar caregiving expenses from Harrell Sr.'s funds, including in cash.  *See* R.C. 1337.32 ("an agent is entitled to reimbursement of expenses reasonably incurred on behalf of the principal and to compensation that is reasonable under the circumstances").

**{¶28}**  Because we are dealing here with a criminal prosecution, the State bore the heavy burden of introducing evidence to prove beyond a reasonable doubt, not merely that Regina spent Harrell Sr.'s funds, but that she spent them in impermissible ways. Its primary evidence of misappropriation were monthly statements from the Chase and U.S. Bank accounts.

{¶29}  The U.S. Bank statements concerned the account under both Regina's and Harrell Sr.'s names, into which Harrell Sr.'s social security payments were deposited. According to these statements, the U.S. Bank account was closed on February 28, 2018, before Harrell Sr. entered long-term nursing care on March 8, 2018. While some testimony suggested that Harrell Sr. was placed on a ventilator some time prior to entering long-term care, the testimony unquestionably demonstrated that, when he entered long-term care on March 8, he was on a ventilator and generally unable to communicate. We must presume that, absent evidence to the contrary, Harrell Sr. could communicate and travel prior to that date. If he could communicate and travel during the period while the U.S. Bank account was open, Harrell Sr. could have made or authorized some or all of the withdrawals from that account himself— even authorized frivolous gifts for Regina's benefit. The State has offered no evidence to the contrary. Without such evidence regarding the scope of Harrell Sr.'s express authorization during the period while he could presumably communicate, the U.S. Bank statements cannot support an allegation that any funds were used beyond the scope of authorization.

{¶30}  This leaves us with the statements from the Chase Bank account in Regina's name, into which the pension payments of Harrell Sr.'s late wife were deposited. These statements were dated through November 19, 2019, and therefore encompassed the period during which Harrell Sr. was in nursing-home care and unable to speak. These statements reveal hundreds of withdrawals and debits, which, for ease, we can divide into four categories: (1) ordinary, everyday expenditures at retail establishments like Kroger, to ordinary businesses like a dry-cleaner, or for necessary debts like bills;  (2) cash withdrawals, either at ATMs or as cash-back

transactions at retail establishments; (3) payments to casinos; and (4) fees, including ATM and overdraft fees.

{¶31} The State bore the burden of showing which, if any, of these transactions were gratuitous self-payments beyond Harrell Sr.'s authorization. The State focused primarily on Regina's gambling expenditures. The Chase Bank statements reveal that at least *some* of Harrell Sr.'s pension payments were spent at gambling establishments, like Miami Valley Gaming, during the months when Harrell Sr. was in long-term care and unable to speak. The OAG investigator testified that Harrell Sr.'s money "went to [Regina's] personal credit cards, ATM, casino, Miami Valley Gaming, Wal-Mart."

{¶32} Testimony from Regina's family corroborated the fact that Regina frequently gambled. Regina herself testified that, prior to his entering long-term care, she would frequent casinos with her father. Regina's brother, Harrell Collins Jr. ("Harell Jr."), testified that Regina would take Harrell Sr. to casinos when he was still mobile, and that such gambling was commonplace in their family. The State also introduced the OAG's investigative report into evidence, which included a handwritten statement by Regina's sister, Sharon. That statement, which was read into the record, suggested that Regina was not competent to manage Harrell Sr.'s finances and alleged that Regina had a gambling addiction.

{¶33} Other than the evidence concerning gambling, the State offered little other explanation of where the money went. The OAG investigator suggested the funds were used to pay off Regina's personal credit card, were withdrawn at ATMs, and were spent at Wal-Mart. The investigator testified that she "didn't see anything showing" that Regina had spent Harrell Sr.'s money "for the benefit of" Harrell Sr., and that

"there was a lot of cash withdrawals and casinos during the timeframe when [Harrell Sr.] was in a nursing facility."

{¶34} So, which transactions did the State's evidence prove were impermissible self-gifts, beyond the scope of authorization?

{¶35} *First*, the State offered no evidence sufficient to show that any transactions prior to March 8, 2018—when Harrell Sr. went into long-term nursing care—were beyond the scope of Harrell Sr.'s express or implied authorization. Harrell Sr. could have approved these transactions—and the only relevant testimony on record, apart from generalized and conclusory investigator statements, supports such a theory. Therefore, we hold that the State failed to introduce evidence sufficient to demonstrate that Regina misappropriated any of the funds spent from either the U.S. Bank or the Chase Bank accounts prior to March 8, 2018. This covers the entire period in which the U.S. Bank account was open.

{¶36} *Second*, the State's evidence was clearly sufficient to demonstrate that any money spent at casinos after Harrell Sr. went into long-term nursing care went beyond Regina's authorization under the power of attorney. Money Regina spent at a casino was clearly not spent for her father's benefit or in his "best interest"; it was a gift Regina made to herself from Harrell Sr.'s property. Perhaps Harrell Sr. would have blessed such expenses, had he retained control of his finances. But when he gave Regina his power of attorney, he did not expressly give her the authority to make gifts—to herself or anyone else. Regina was therefore bound to spend Harrell Sr.'s funds on Harrell Sr., not on gifts for herself or others.

{¶37} Further, even if the instrument had authorized self-gifts, Regina would not have been entitled to dispose of Harrell Sr.'s property for her own gambling to the

exclusion of his bills. The State offered ample evidence to demonstrate that Harrell Sr.'s nursing-home bills were not being paid. Regina does not contest this fact, instead arguing that she refused to pay the homes because of the substandard care they provided.

{¶38} But even if Regina's allegations against the nursing homes are true, and even if she could legally withhold payment to them, she still would not be permitted to spend the last cents in Harrell Sr.'s account each month on her own gambling. Yet the Chase Bank statements reveal that, with one exception, Regina started every billing cycle between March 20, 2018, and November 19, 2019, with an account balance in the negative—despite receiving pension payments each month that were sufficient to bring the account back into the black. Regina's casino payments contributed to this monthly deficit. We therefore hold that the State presented sufficient evidence to support a finding that any of Harrell Sr.'s money spent at casinos while he was in long-term nursing care, was spent beyond the scope of authorization under the power of attorney.

{¶39} *Third*, the State's evidence supported the inference that Regina's funds withdrawn from a particular ATM located at a casino were likewise spent beyond the scope of authorization. The Chase Bank statements listed numerous withdrawals from an ATM located at "6000 State Route 63 Lebanon OH." The OAG investigator testified that this was the address of Miami Valley Gaming, a casino and gambling establishment in Lebanon, Ohio. Regina confirmed that the ATM was, in fact, located at the casino. While the State did not directly demonstrate what the money withdrawn at the Miami Valley Gaming ATM was used for, the evidence of Regina's gambling and expenditures at Miami Valley Gaming, when coupled with the ATM's location and

viewed in the State's favor, supported a finding that Regina had used these funds, too, for gambling. We therefore hold that the State presented sufficient evidence for the trier of fact to conclude that money withdrawn from the ATM at 6000 S.R. 63 was used to gamble. Thus, to the extent those funds belonged to Harrell Sr., and to the extent Regina withdrew them while Harrell Sr. was in long-term care, we hold that the State produced sufficient evidence that they were spent beyond the scope of authorization.

{¶40} *Fourth*, the evidence also supported the conclusion that the fees and charges related to gambling went beyond the scope of Regina's authorization. The bank statements show that many of Regina's casino-related payments and withdrawals made at the Miami Valley Gaming ATM led to overdraft fees and finance charges. Those fees and charges were generally paid off using funds from the next month's pension deposit. Because the evidence was sufficient to find that Regina's use of Harrell Sr.'s funds for gambling fell outside the scope of authorization, we hold that the same evidence was sufficient to show that Regina's use of Harrell Sr.'s funds to pay off charges incurred as a direct consequence of those gambling expenditures and withdrawals did, too.

{¶41} *Fifth*, the State did not offer evidence that any other withdrawals went beyond the scope of Regina's authorization under the power of attorney. True, many of the other charges on the account statements may appear personal in nature or look surprising, given the mounting stack of Harrell Sr.'s unpaid nursing-home bills. But the State was required to offer proof that Regina's car rentals did not furnish her with necessary transportation to care for her father, that her cash withdrawals were not used to make mortgage payments on her father's home, or that her retail purchases from Wal-Mart did not contain items for her father's wellbeing.

{¶42} Odd and unpredictable expenditures may become necessary when loved ones enter long-term nursing-home care, and a broad, general power of attorney is meant to ensure that caregivers have flexibility and available funds to meet those demands. Given the breadth of Regina's authority under the power of attorney and the presumption of innocence, the State bore the burden of introducing evidence to prove Regina used specific funds to make impermissible, unauthorized self-gifts.[5] But the State's evidence furnished no basis to conclude that every cent Regina spent—or even every cent Regina failed to spend on Harrell Sr.'s nursing-home bills—went towards purely selfish pursuits. We therefore hold that, except for those three groups of gambling-related withdrawals and charges that we have identified above, the State failed to introduce sufficient evidence to prove Regina spent Harrell Sr.'s money in a manner beyond the authorization in his power of attorney. R.C. 2912.03(A)(2) does not criminalize the nonpayment of nursing home bills; it criminalizes the use of funds beyond the scope of express or implied consent.

{¶43} Based on these holdings, we turn to calculating the amounts for which the State *did* offer sufficient evidence. The relevant account debits between March 20, 2018, and November 19, 2019 (the portion of the charged period during which her father was in long-term care), break down as follows: (1) $5,638.73 in payments to casinos, (2) $1,815.84 withdrawn at the ATM located at 6000 S.R. 63 in Lebanon,

---

[5] We note that, under the UPOAA, "[e]xcept as otherwise provided in the power of attorney," an agent has a duty to "[k]eep a record of all receipts, disbursements, and transactions made on behalf of the principal." R.C. 1337.34(B)(4). It is not clear whether or how the State's ability to prove a breach of this duty would affect a sufficiency challenge to a conviction under R.C. 2913.02(A)(2). But the State has not argued that Regina breached any such duty, and the trial court did not make any findings to that effect. We therefore assume, without deciding, either that Regina did not breach any such duty, or that such a duty would not affect the State's burden in this case and resolve the case accordingly. As such, we express no opinion on what impact, if any, the duty imposed by R.C. 1337.34(B)(4) has on a prosecution under R.C. 2913.02(A)(2), and we reserve that issue for a case in which the parties have raised and briefed it.

Ohio, and (3) $1,095.00 in overdraft fees for the charges included in the totals above. Altogether, that comes to $8,549.57 in funds that the State proved were spent in ways the power of attorney did not authorize.

{¶44} But there is another wrinkle: some of those funds *may not* have been Harrell Sr.'s property. Regina testified, and the account statements corroborate, that she sometimes deposited her *own* funds into the Chase Bank account, including paychecks she received as a member of the Forest Park City Council. Regina was, of course, legally entitled to spend her own funds however she chose, including on gambling. Adding together every deposit that did not come from the pension plan or from a refund of another transaction, Regina deposited as much as $5,818.61 between October 2018 and the close of the charged period.

{¶45} The State offered no evidence to suggest that Regina did not use her own funds to gamble. Thus, given the State's burden, we must assume that Regina gambled with her own funds, whenever such funds were available, before gambling with her father's funds. This leaves us with the task of calculating how Regina's deposits diminished the sum of all unauthorized expenditures described above.

{¶46} If we calculate the difference using the method most favorable to Regina—i.e., by subtracting the total of all potentially personal deposits from the total of all the beyond-the-scope withdrawals calculated above—we are left with $2,730.96 in provably unauthorized expenditures.

{¶47} And if we use the method most favorable to the State—i.e., if we subtract the amount Regina deposited from the amount of gambling-related expenses on a month-by-month basis, and do not permit the amount of deposited funds beyond gambling expense to roll over to the next month—we get a difference of $3,989.95.

{¶48} Under either method, the total amount of misappropriated funds falls below the $7,500 threshold required for third-degree felony theft from a person in a protected class, the crime for which Regina was found guilty at trial. *See* R.C. 2913.02(B)(3). Likewise, both calculated totals exceed the $1,000 minimum required to constitute a *fourth*-degree felony under the same statute. *Id.* ("If the value of the property or services stolen is one thousand dollars or more and is less than seven thousand five hundred dollars, theft from a person in a protected class is a felony of the fourth degree.").

{¶49} We therefore hold that the State's evidence was insufficient to convict Regina for theft of between $7,500 and $37,499.99 from a person in a protected class—the third-degree felony for which she was found guilty below. However, we also hold that the same evidence *was* sufficient to convict her for the fourth-degree felony of the same offense, i.e., theft of between $1,000 and $7,499.99 from a person in a protected class.

{¶50} Further, a conviction for fourth-degree felony theft from a person in a protected class would not be against the manifest weight of the evidence presented to the trial court. As demonstrated, the bank statements show that Regina withdrew funds that must have been the property of Harrell Sr. and used them to gamble. She did so while Harrell Sr. could not possibly have joined her in said gambling, while he was unable to communicate his intentions, and while his nursing-home bills remained unpaid. These gambling expenses constituted gifts, which Regina made to herself. Harrell Sr.'s power of attorney did not permit Regina to make gifts, meaning that any such gifts were beyond the scope of Harrell Sr.'s consent. Regina offered no evidence that suggested the power of attorney was incomplete or that the gambling-related

transactions we described above were *not*, in fact, used to gamble. Therefore, based on the calculations above, a conviction for theft from a person in a protected class of property worth at least $1,000 and less than $7,500 would not have created such a manifest miscarriage of justice as to warrant a new trial. *See McKelton*, 2016-Ohio-5735, at ¶ 328.

{¶51} For the foregoing reasons, we hold that the State's evidence, while inadequate to sustain her third-degree felony conviction, was adequate to find her guilty of the lesser-included offense of fourth-degree felony theft from a person in a protected class under R.C. 2912.03(A)(2) and (B)(3). We therefore sustain Regina's first and second assignments of error in part and overrule them in part.

## B. Whether the Nursing Homes Were "Victims" Entitled to Restitution

{¶52} In her third assignment of error, Regina argues that the trial court erred in ordering her to pay restitution to the two nursing homes. She argues that the nursing homes are not appropriate recipients of restitution because they do not qualify as "victims" of her theft, within the meaning of Ohio's financial-sanctions-and-restitution statute, R.C. 2929.18.

{¶53} "The issue of who constitutes a 'victim' under R.C. 2929.18(A)(1) or to whom restitution may appropriately be awarded under the statute is a question of law that is reviewed de novo." *State v. Jones*, 2020-Ohio-81, ¶ 6 (1st Dist.). In this case, however, Regina did not object to the restitution award, and consequently this court's review is for plain error. *State v. Little*, 2019-Ohio-4488, ¶ 8 (1st Dist.). A reviewing court will "reverse a sentence for plain error only under exceptional circumstances to prevent a manifest miscarriage of justice." *Id*. However, this court has previously held

that an order of restitution to an improper victim constitutes plain error. *State v. Martin*, 2013-Ohio-2441, ¶ 7 (1st Dist.).

{¶54} Ohio's restitution-and-financial-sanctions statute does not define the word "victim." *See* R.C. 2929.18; *Jones* at ¶ 7. "Victim" is, however, defined in Marsy's Law—a 2018 Ohio constitutional amendment that gives victims a right "to full and timely restitution from the person who committed the criminal offense" against them. Ohio Const., art. I, § 10a(A)(7); *see id.* at § 10a(D) (defining "victim"). To harmonize R.C. 2929.18(A)(1) with the requirements of our state constitution, this court has "applied the definition of victim set forth in Marsy's Law" in the statutory context. *State v. Crosby*, 2024-Ohio-2877, ¶ 7 (1st Dist.).

{¶55} Marsy's Law defines victim to include "a person against whom the criminal offense or delinquent act is committed or who is directly and proximately harmed by the commission of the offense or act." Ohio Const., art. I, § 10a(D). We have recently clarified this definition as follows:

> Harm will be considered a direct and proximate result of the offender's conduct when "the consequence is foreseeable and is produced by the natural and continuous sequence of events following the act." *State v. Yerkey*, [2022-Ohio-4298, ¶ 16]. This court has described a direct result as one that would not have occurred "but for" the commission of the offense. *State v. Borger*, [2023-Ohio-1124, ¶ 19 (1st Dist.)].

*Crosby* at ¶ 7.

{¶56} The State argues that the restitution award in this case was proper because the nursing homes suffered economic harm because Harrell Sr.'s bills were not paid, and that harm was a direct result of Regina's misappropriation of Harrell

Sr.'s funds. The State suggests, without citation, that the nursing homes had a property interest in the social security and pension payments made to Harrell Sr., because the nursing homes had provided medical care to him, for which they were entitled to reimbursement.

{¶57} While Harrell Sr. may have owed the nursing homes an unpaid debt, a right to demand payment of a debt is not an interest in the debtor's property; it is merely a "chose in action" consisting of a right to sue. *See Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 2006-Ohio-6551, ¶ 19-20, quoting *Black's Law Dictionary* (8th Ed. 2004) (defining "chose in action" as "[t]he right to bring an action to recover a debt, money, or thing").

{¶58} A chose in action is itself a form of property, but it does not give its holder a property interest in a debtor's assets. To obtain an interest in Harrell Sr.'s property, the nursing homes would need to reduce their choses in action to judgments, which they could enforce by lien or levy against Harrell Sr.'s assets.

{¶59} By arguing that the nursing homes had a "property interest" that was directly harmed by Regina's theft, the State essentially argues that any creditor, made less likely to collect a debt after a theft from the debtor, becomes a "victim," entitled to rights and relief under Marsy's law. But if this were true, then it would follow that Harrell Sr.'s utility service, cell phone provider, and credit card company might likewise be entitled to Marsy's Law rights in Regina's prosecution, so long as Harrell Sr. owed them money at the time of or after his property was stolen.

{¶60} But Verizon or Duke Energy would not be entitled to restitution in this case for the same reason the nursing homes are not: because one who holds a chose in action permitting them to sue a victim of theft is only *indirectly* harmed by that theft.

And under Marsy's Law, indirect harm does not a victim make. Underpinning this legalese-heavy conclusion is an easy-to-understand reality: even if Regina had not misappropriated Harrell Sr.'s funds, the nursing homes could not be certain they would receive Harrell Sr.'s money until they had initiated a lawsuit, obtained a judgment, and enforced it by lien or levy. Regina was adamant in her refusal to pay the bills because of alleged deficiencies in Harrell Sr.'s care. But, the resolution of such contract claims is the purview of civil litigation, not restitution hearings.

{¶61} The State nevertheless likens this case to *State v. Allen*, 2019-Ohio-4757, in which a defendant committed theft by cashing a fraudulent check. In *Allen*, the Ohio Supreme Court held that the bank, which maintained the account on which the fraudulent check drew, was a proper victim for restitution purposes. *Id.* at ¶ 12. This, the Court said, was because "it is the bank that is defrauded and hence, it is the bank that is the object of the crime; it is the bank that suffers the economic loss; and, it is the bank that loses property in which it has an interest at the moment of the fraud." *Id.* The Court also noted that a "person or a business entity is paradigmatically a victim when they are duped into giving their property to a thief, and they suffer an economic loss as a result." *Id.* at ¶ 10.

{¶62} The State's reliance on *Allen* is misplaced. The nursing homes in this case are differently situated than the bank in *Allen* in three key respects:

{¶63} *First*, the funds Regina stole were never the property of the nursing homes to begin with. In *Allen*, the Court treated the bank not as a creditor, but as a *debtor*, who received funds from accountholders, and who was obligated to repay those funds upon demand. *Id.* at ¶ 6. But here, the nursing homes were Harrell Sr.'s *creditors*, not his debtors. And because they were creditors, the nursing homes did not

have present rights in Harrell Sr.'s money—only choses in action, giving them the right to sue him.

{¶64} *Second*, and relatedly, Harrell Sr. did not "deposit[] money" with the nursing homes, as the accountholder in *Allen* did. *Allen*, 2019-Ohio-4757, at ¶ 6. Thus, unlike the accountholders in *Allen*, the nursing homes could not claim to have "gain[ed] a property interest in the money" by pointing to their possession. *Id.*

{¶65} *Third*, Regina did not "dupe" the nursing homes into giving her money by fraud, as the defendant in *Allen* duped the bank with his fraudulent checks. Instead, Regina used her own ATM card to withdraw money directly from accounts she shared with Harrell Sr., and then spent that money on things other than paying nursing-home bills. Regina did not defraud the nursing homes; she just didn't pay them.

{¶66} Harrell Sr., not the nursing homes, was the victim of this crime. On these facts, it is Harrell Sr. who "is defrauded and hence, it is [he who] is the object of the crime; it is [he who] suffers the economic loss; and, it is [he who] loses property in which [he] has an interest at the moment of the fraud." *Id.* at ¶ 12. Harrell Sr. was the party "directly harmed," while the nursing homes were harmed only in indirect and speculative ways. Harrell Sr. was therefore the party entitled to recover restitution under R.C. 2929.18. The nursing homes, in turn, could have sued Harrell Sr. for repayment of the debt. And while Harrell Sr. has since passed away, a victim's estate remains a proper recipient of restitution under R.C. 2929.18(A)(1), and creditors may bring claims against it. *See* R.C. 2117.06.

{¶67} The nursing homes were not "directly and proximately harmed" by Regina's theft, and they were therefore not "victims" within the meaning of R.C.

2929.18(A)(1) and Marsy's Law. The trial court plainly erred in awarding them restitution, and so we sustain Regina's third assignment of error.

### C. Ineffective Assistance of Counsel

{¶68} In her fourth assignment of error, Regina argues that her trial counsel was ineffective. Both the Sixth Amendment to the United States Constitution and Article 1, Section 10 of the Ohio Constitution protect a criminal defendant's right to effective assistance of counsel at her trial. *State v. Bell*, 2023-Ohio-1010, ¶ 9 (1st Dist.). To establish a claim that her counsel was unconstitutionally ineffective, Regina must show (1) that her "counsel's performance was deficient" and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord Bell* at ¶ 9. Proving that counsel's performance was "deficient," in the *Strickland* sense, requires a defendant to "overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). And *Strickland*'s prejudice prong requires that she show "a reasonable probability that, but for counsel's unprofessional error, the result of the trial would have been different." *State v. Jeffries*, 2018-Ohio-2160, ¶ 76 (1st Dist.), citing *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus.

{¶69} Regina alleges that her trial counsel was ineffective in three principal ways: (1) he failed to introduce potentially exculpatory evidence, (2) he failed to object to the admission of hearsay statements, and (3) he failed to object to the order to pay restitution to an improper victim. As we shall explain, all three arguments fail: the first because it relies upon evidence outside the record, the second because the statements at issue did not prejudice Regina's case, and the third because it is moot.

26

### 1. Failure to Present Exculpatory Evidence

**{¶70}** In her brief, Regina identifies the following evidence that she had requested to be presented at trial, which her counsel did not attempt to present: (a) "witnesses that could testify about the abuse that occurred at the nursing homes," (b) "medical records to show the same," (c) "Medicaid records showing complaints against the facilities for abuse and neglect," and (d) "a video showing her father speaking for the first time in [a] year."[6] All of the evidence Regina identifies speaks to the substandard level of care she claims Harrell Sr. received, which Regina claims justified her nonpayment of the balances owed to the nursing homes.

**{¶71}** Evidence that trial counsel failed to introduce is, by definition, not included in the trial record. And an appellate court generally "cannot stray outside of the trial record to evaluate" the value of unintroduced evidence for the purpose of adjudicating an ineffective-assistance claim. *Bell,* 2023-Ohio-1010, at ¶ 9 (1st Dist.); *see* App.R.12(A)(1)(b) (requiring an appellate court to "[d]etermine the appeal on its merits on the assignments of error set forth in the briefs . . . , the record on appeal . . . , and, unless waived, the oral argument"). As a result, it is often incredibly difficult, if not impossible, for a defendant on direct appeal to challenge the effectiveness of her trial counsel under a failure-to-introduce-evidence theory. *Bell* at ¶ 9.

**{¶72}** The success or failure of Regina's failure-to-introduce argument turns on the contents and character of evidence dehors the trial record. We thus lack record

---

[6] At allocution, Regina claimed that her father was able to speak for short spans of time while in the nursing home, and that, during one such spell, he told her that he wanted to get out. Regina claims she responded that there was no other place to take him and that they still owed money to the nursing home. Regina then described Harrell Sr.'s reply: "His words were, fuck them. Don't give them shit. Get me out of here." Also at allocution, Regina represented that there was a video of Harrell Sr. speaking to her and other family members. She asserts that this video would show that Harrell Sr. was at times verbal, and that this would corroborate her recollections of Harrell Sr. telling her not to pay the nursing homes.

evidence as to what the 51 witnesses Regina wished to introduce would have said. We lack record evidence as to what the Medicaid complaints contained. And most glaringly, we lack the video to assess its value to Regina's defense. We have only Regina's representations at allocution and in her brief as to their substance—and neither of these are evidence. *See State ex rel. Luonuansuu v. King*, 2020-Ohio-4286, ¶ 17 ("the briefs and memoranda of the parties are not evidence" (Cleaned up.)); *State v. Roberts*, 2013-Ohio-4580, ¶ 67 ("allocution under Crim.R. 32(A)(1) is unsworn and thus may not technically amount to evidence"); *see also Biddinger v. State*, 868 N.E.2d 407, 413 (Ind. 2007) (noting that "a statement in allocution is not evidence," but "more in the nature of closing argument").

**{¶73}** Claims that depend upon evidence outside the trial record are better suited for proceedings where that evidence can be introduced, such as a petition for postconviction relief under R.C. 2953.21 or a motion for a new trial under Crim.R. 33. And because ineffective assistance "claim[s] regarding counsel's failure to present evidence" are ones that "truly depend on evidence outside the trial record," the Ohio Supreme Court has acknowledged that they will not be barred by res judicata in a postconviction proceeding, even if they were known to or raised by the defendant on direct appeal. *State v. Blanton*, 2022-Ohio-3985, ¶ 41; *accord State v. Smith*, 17 Ohio St.3d 98, 101, fn. 1 (1985) (noting that "*res judicata* may not be a bar to postconviction relief" where issue "could not fairly have been determined without resort to evidence *dehors* the record").

**{¶74}** Because the record does not contain any of the evidence Regina argues should have been presented, any comments we might make regarding its exculpatory value "would be purely speculative." *State v. Smith*, 2020-Ohio-4976, ¶ 75 (1st Dist.).

Without seeing or hearing the evidence, we cannot conclude that trial counsel's performance was deficient, nor that Regina was prejudiced, and we therefore reject her failure-to-present argument.

## 2. *Failure to Object to Hearsay Statements*

**{¶75}** Regina next suggests that counsel was deficient for failing to object to the admission of a written statement by her sister, Sharon. The relevant portion of the statement, read into the record during trial, said, "I hereby attest that Regina has a gambling addiction and has not paid for my father's medical bills in residency at Three Rivers. In addition, it is my position that she is incompetent to be his Power of Attorney."[7] A full copy of the handwritten statement was contained within the compiled records making up State's Exhibit 4.

**{¶76}** "Counsel's failure to make objections is not, by itself, enough to sustain a claim for ineffective assistance of counsel." *State v. Hackney*, 2016-Ohio-4609, ¶ 39 (1st Dist.). Rather, the appellant "must show both that there was a substantial violation of counsel's duties and that he was materially prejudiced by counsel's ineffectiveness." *State v. Conway*, 2006-Ohio-791, ¶ 168.

**{¶77}** Even assuming that Sharon's statement was inadmissible hearsay, it did not prejudice Regina. The State's case was built upon the theory that Regina gambled away Harrell Sr.'s money while failing to pay his bills. Sharon's statement, which was the only evidence of a gambling *addiction*, did suggest an explanation for that behavior. But the State did not need to prove Regina had any sort of addiction to prove that she spent money at Miami Valley Gaming and Jack Casino; the bank statements

---

[7] The text of the transcript does not perfectly match the text in the exhibit. For the purposes of Regina's argument, however, the quoted excerpt is substantively identical to the written statement from which it was taken.

said it already. And we have already held that the State presented insufficient evidence to convict Regina of appropriating any funds other than those directly linked to gambling. Whether Regina gambled because of addiction, as Sharon suggested, or simple desire, the State adequately proved that she withdrew the funds we described above to gamble. Admission of Sharon's statement did not alter the outcome.

**{¶78}** Because the admission of Sharon's statement was not prejudicial, Regina's second ineffective-assistance argument fails.

### 3. *Failure to Object to Restitution Award*

**{¶79}** In her final ineffective-assistance argument, Regina contends that her trial counsel was deficient in not objecting to the inclusion of the nursing homes in the restitution order. But we have already determined that the trial court plainly erred by including the nursing homes as "victims" and awarding them restitution. That determination means we are already required to vacate the restitution order, which is all the relief Regina could seek under this ineffective-assistance theory. Our decision to sustain Regina's second assignment of error thus renders Regina's third ineffective-assistance argument moot.

**{¶80}** Regina's fourth assignment of error is therefore overruled.

### III. CONCLUSION

**{¶81}** The State's evidence was not sufficient to convict Regina of third-degree felony theft from a person in a protected class, but it was sufficient to convict her of the fourth-degree felony of the same offense. "When the evidence shows that a defendant is not guilty of the crime for which he was convicted, but is guilty of a lesser-included offense, this court may modify the conviction." *State v. Davis*, 2006-Ohio-4599, ¶ 13 (1st Dist.), citing App.R. 12(B). Therefore, we affirm Regina's

conviction as modified and vacate her sentence. We remand this cause to the trial court with instructions to enter a conviction on the lesser-included offense of fourth-degree felony theft and to conduct a new sentencing hearing on the modified conviction.

Judgment accordingly.

**ZAYAS, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.