[Cite as *State v. Thomas*, 2025-Ohio-1343.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240151 |
| | | TRIAL NO. B-2205931 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| MICHAEL THOMAS, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 16, 2025


*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Law Office of Michele L. Berry, LLC,* and *Michele L. Berry* for Defendant-Appellant.

**BOCK, Judge.**

**{¶1}**  The State charged defendant-appellant Michael Thomas on multiple counts related to a shooting. After his closing argument in a bench trial, Thomas learned that investigators had failed to turn over a report containing potentially exculpatory evidence. The trial court granted Thomas multiple continuances and allowed him to reopen his case to present the newly disclosed evidence, but it denied his request for a mistrial. The trial court found Thomas guilty. On appeal, Thomas argues that his due-process rights were violated.

**{¶2}**  We hold that Thomas's due-process rights were not violated under *Brady v. Maryland*, 373 U.S. 83 (1963). The new evidence was disclosed during trial and the trial court provided Thomas continuances and allowed him to reopen his case. Further, the trial court did not abuse its discretion in denying Thomas's request for a mistrial because the trial court mitigated any potential prejudice caused by the untimely disclosure.

**{¶3}**  We overrule Thomas's assignments of error and affirm the trial court's judgment.

## I.  *Factual and Procedural History*

### A.  Procedural History

**{¶4}**  The State indicted Thomas on multiple assault and weapons charges stemming from a shooting in the Evanston neighborhood of Cincinnati. Thomas waived his right to a jury trial and tried his case to the bench in August 2023. After the close of evidence and following Thomas's closing argument, the State informed the trial court that a detective had just learned about potentially exculpatory evidence that had not been disclosed.

**{¶5}** The trial court continued the trial for the parties to investigate the evidence. After several continuances, Thomas moved for a mistrial, which the trial court denied. In December 2023, the trial court allowed Thomas to reopen his case-in-chief. There, Thomas introduced the previously withheld evidence and impeached the lead detective with that evidence.

**{¶6}** The trial court found Thomas guilty on all counts and imposed a prison term. Thomas has appealed.

### B. Factual history

#### 1. T.G. and J.G. argued with Thomas

**{¶7}** On a November afternoon in 2022, T.G. and her grandson were in her apartment on Durrell Avenue in Evanston. When it was time for the child's mother to pick him up, T.G. brought her grandson outside to the parking lot and put him in his mother's car. T.G. noticed that the car was blocking a maroon Ford Focus. Shortly after T.G. went back into her apartment, her neighbor H.W. knocked on her door and told T.G. about an issue in the parking lot. T.G., her daughter J.G. (who also lived in the apartment building), and H.W. walked outside.

**{¶8}** In the parking lot, J.G. saw "a very angry man yelling at my nephew's mother." J.G. identified Thomas, who was next to a "maroonish-purple looking" car, as the man and testified that he was yelling at the child's mother to move her car so that Thomas could leave. J.G. had never seen Thomas in the maroon car before, but she had seen R.C., who lived downstairs, in the vehicle.

**{¶9}** T.G. testified that Thomas lived in apartment seven with his girlfriend, R.C., and that both Thomas and R.C. drove the maroon Ford Focus. Although T.G. did not know Thomas's name, she had seen him in the building "all the time."

{¶10} T.G. and J.G. argued with Thomas. T.G. stated that despite the child's mother moving her car, Thomas continued arguing and asked T.G. to find a man for him to fight. Thomas yelled, "It's on now. It's on now," and left in the maroon Ford Focus. J.G., T.G., and H.W. returned inside.

### 2. *Hours later, someone in the maroon Ford Focus shot at J.G. and H.W.*

{¶11} Later that evening, J.G. left her apartment and walked towards H.W.'s car as it idled in the street in front of the apartment building. J.G. testified that, as she left the apartment building, "I had seen that—the car pulling in. And when he seen—I was walking out, and he seen me, like, coming out. I didn't really see who was the driver up until he rolled the window down." J.G. continued, "[H]e pulled in and stopped and rolled the window down. And I started walking, and he, like, reversed really fast back behind [H.W.'s] car." J.G. testified that she saw Thomas's face with the window down.

{¶12} J.G. recalled, "By the time I got in the car and tried to close the door, he was already shooting." J.G. got into H.W.'s car, where H.W. and her three-year-old son were seated. J.G. did not see anyone else in the Ford Focus, though she stated that she "really wasn't looking. I looked at him and then that was it." J.G. heard several shots fired at H.W.'s car and heard bullets hit the car. She stated that the shooter followed them in the Ford Focus and continued shooting as they drove away.

{¶13} J.G. called her mom and the police. In the 911 call, J.G. did not know the shooter's name but identified him as the man who lived in "apartment 7."

### 3. *J.G. spoke with officers on the night of the shooting*

{¶14} When J.G. returned to her apartment, officers showed J.G. a photo of Thomas. She identified him as the man that she believed was the shooter.

{¶15} J.G. testified that the bullets struck the driver's side and rear of H.W.'s car, and denied having told officers on the night of the shooting that the damage was to the passenger side. After viewing bodycam footage, however, J.G. agreed that she had told the officers the bullets struck the passenger side of H.W.'s car and that she did so by mistake. While speaking with officers, J.G. changed her description of the damage, stating that the damage was to the driver's side. J.G. also told officers that H.W.'s car's tires were shot, but the tires were not damaged.

{¶16} Officer Bicknell's body-worn camera footage from the night of the shooting showed J.G. telling officers that R.C.'s boyfriend shot at her and "the only reason I knew it was him was because it was the car he would drive." After an officer asked if J.G. saw Thomas fire the shots, rather than seeing shots come from the car, J.G. responded that she saw the car and knew that "they" drove the car.

{¶17} Bicknell and Officer Benjamin Allen, in front of J.G. and T.G., discussed the shooting: "So it could be him, or it could be someone who has access to that car." In response to an officer asking J.G. if she had seen multiple people or only Thomas, she answered, "No." When an officer asked if Thomas had been driving the car, J.G. stated, "Yeah, he always driving it." J.G. then stated that she had not seen Thomas with a gun, "[b]ut I know, its they car, it's the maroon car."

{¶18} The officers explained that they were

trying to pinpoint this as much as we can, right now, that's all. Cause, if there was somebody else in the car, somebody could try to say, "Oh well it wasn't me that was shooting, it was this other guy." So, that's kinda what we are getting at by asking if you saw him with the gun.

J.G. told officers, "The shots had to be coming from the driver's side because my friend's driver's side is all shot up."

5

### 4. R.C. told police that her nephew had her car

**{¶19}** Officer Murrell also responded and met R.C. outside the apartment. Murrell described R.C. as "evasive" and not "forthcoming with who was in her place."

**{¶20}** R.C. told officers that her nephew had taken her car out that night and left it at a different apartment in Avondale. R.C. initially told officers that a man named "Jeremy" lived in her apartment and was involved in an argument in the parking lot earlier in the day. R.C. later stated that "Mike" was involved in the altercation. R.C. told Murrell Michael Thomas's name and officers obtained a photo of Thomas.

**{¶21}** Officer Allen showed J.G. a photo of "Jeremy," the man that R.C. stated lived in her apartment, but J.G. stated that the man in the photo was not the shooter.

### 5. Police located shell casings

**{¶22}** Bicknell found five shell casings near the apartment building. He testified that J.G.'s description of the shooting was "consistent" with the location of the shell casings. Police found the shell casings within five-to-ten feet of one another, which Bicknell agreed was "fairly close together." Officers did not locate any damage to other cars on the street and did not recover the gun.

### 6. J.G. later said she saw Thomas shooting

**{¶23}** Four police officers returned to the apartment building the day after the shooting. None of the officers' body-worn cameras were activated. Officers located R.C.'s maroon Ford Focus at the apartment. She consented to officers searching her car—the officers did not find any evidence in the vehicle.

**{¶24}** Bicknell spoke with J.G. again. He testified that J.G. confirmed that "she had made eye contact with Mr. Thomas, and that he had rolled the window down, and they made eye contact before she attempted to get to [H.W.'s] car." J.G. told Bicknell that she did not see anybody other than Thomas in the car. J.G. provided Bicknell

photos purportedly showing the damage to H.W.'s car caused by the shooting. About seven months later, Bicknell located H.W.'s car, which had damage consistent with the photos J.G. had provided.

**{¶25}** In December 2022, police arrested Thomas at his mother's apartment. Officers located a handgun magazine and one live 9 mm round. The round was a different brand than the casings found at the scene of the shooting. And the magazine did not fit the caliber of the bullet located at the scene of the shooting.

### C. The State disclosed exculpatory evidence at trial

**{¶26}** The trial court held a bench trial starting on August 16, 2023. After the State rested, Thomas moved for an acquittal under Crim.R. 29. The trial court denied his motion. Then, after the State's and Thomas's closing arguments, but before the State's rebuttal, the State informed the trial court that earlier that day, Officer Zopfi learned that a NIBIN report determined that the shell casings found on Durrell Avenue at the scene of the shooting matched a different shooting from March 2022. Additionally, on the second day of Thomas's trial, police arrested two individuals who had a gun that matched the Durrell shooting shell casings. The trial court continued the trial to let the parties review the information.

**{¶27}** In September 2023, after a second continuance, Thomas requested a mistrial due to the late disclosure. Thomas explained that he had not had "an adequate opportunity to look into" the two individuals identified in the NIBIN report. Thomas also stated that there was "a strong possibility that Mr. Thomas would not have waived the jury trial had this information been available to him at an earlier time." The trial court took the motion under advisement and later that month, denied the motion,

though it noted that it would entertain a renewed motion for a mistrial if additional information came to light. The trial court granted another continuance.

**{¶28}** In December 2023, the trial court allowed Thomas to reopen his case. Thomas recalled Zopfi, who conceded that originally, he had testified that there had been no NIBIN match for the shell casings found at the Durrell shooting. Zopfi stated that ordinarily, NIBIN reports are completed within a week of casings being recovered. The NIBIN report showing the match between the shootings was "published" on August 17, 2023, one day after the trial began and five days before Zopfi testified. What "published" means was not explained.

**{¶29}** Zopfi received a notification of a match to the Durrell shell casings after he testified in August. He learned that police arrested Kelvin Freeman and Eric Hunter on August 14, 2023, two days before Thomas's trial started. Freeman had a firearm when he was arrested that matched the casings found at the scene of the Durrell shooting. Zopfi did not know when Freeman had obtained the weapon.

**{¶30}** The August 2023 NIBIN report indicated that Freeman claimed he had received the handgun from an individual named "KJ," who lived in Roselawn. Zopfi testified that, in his experience, it is common for people who use a gun in a crime to sell, dispose of, or give it away.

**{¶31}** Zopfi testified that the August 2023 NIBIN report indicated that the casings from the Durrell shooting and seven casings recovered in March 2022 were fired from the same gun. But three different brands of ammunition were recovered from the March 2022 shooting, the Durrell shooting, and from Freeman when he was arrested in August 2023.

**{¶32}** Zopfi agreed that the March 2022 shooting occurred before the Durrell shooting. Police had no suspects related to the March 2022 shooting. Zopfi confirmed

that the NIBIN report showing a match between the March 2022 and Durrell shootings should have been available well before Thomas's trial began.

**{¶33}** After Zopfi's testimony, Thomas renewed his Crim.R. 29 motion, which the trial court denied, and made additional closing arguments. The trial court found Thomas guilty and imposed a prison sentence. Thomas now appeals.

## II.    *Analysis*

**{¶34}** Thomas raises four assignments of error on appeal. First, he asserts that the State's late disclosure of the NIBIN report violated his due-process rights. Second, Thomas argues he received the ineffective assistance of counsel. Third, he claims that the trial court abused its discretion in denying his motion for a mistrial. Fourth, he argues his convictions are against the manifest weight of the evidence.

### A.  First Assignment of Error

**{¶35}** Thomas asserts that the State failed to timely disclose the exculpatory NIBIN report in violation of his due-process rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

**{¶36}** The State's failure to disclose evidence favorable to an accused violates the accused's due-process rights "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Evidence is material where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). To prevail on a *Brady* claim, a defendant must show that (1) the undisclosed evidence favored the accused, (2) the State, willfully or inadvertently, suppressed the evidence, and (3) the suppression prejudiced the accused. *State v. Green*, 2024-Ohio-3260, ¶ 18 (1st Dist.).

9

### 1. *The NIBIN report was disclosed "during trial"*

**{¶37}** This court has held that no *Brady* violation exists where the State provides the exculpatory information before or during the trial. *State v. Marshall*, 2021-Ohio-816, ¶ 12 (1st Dist.), citing *State v. Wickline*, 50 Ohio St.3d 114, 116 (1990); *see United States v. Agurs*, 427 U.S. 97, 103 (1976) (stating that *Brady* "arguably applies in . . . situations . . . involv[ing] the discovery, after trial, of information which had been known to the prosecution but unknown to the defense."); *but see State v. Iacona*, 93 Ohio St.3d 83, 100 (2001) ("It has, however, been held that the philosophical underpinnings of *Brady* support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial."); *see also State v. Brown*, 2024-Ohio-749, ¶ 32 (declining to decide whether a *Brady* violation can be grounded in evidence disclosed during trial). Moreover, where the State discloses exculpatory evidence before or during trial and the trial court provides opportunities for the accused to use the exculpatory material during trial, there is no prejudice. *State v. Jones*, 2019-Ohio-4862, ¶ 60 (1st Dist.), citing *State v. Aldridge*, 120 Ohio App.3d 122, 146 (2d Dist. 1997).

**{¶38}** Here, the State disclosed the exculpatory material during trial. Though the disclosure was very close to the end of trial, the trial court allowed Thomas months to investigate, reopen his case, and use the 2023 NIBIN report in his defense. Accordingly, under *Wickline* and *Marshall* no *Brady* violation occurred.

### 2. *Thomas has not shown prejudice*

**{¶39}** Assuming, without deciding, that the State's disclosure of evidence during trial constituted a due-process violation, Thomas did not demonstrate prejudice. Under *Iacona*, 93 Ohio St.3d at 100, a due-process violation might occur

when evidence is disclosed during trial if that late disclosure "significantly impairs the fairness of the trial." *Id.* But "'no due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial.'" *Id.,* quoting *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985).

**{¶40}** Thomas argues that the late disclosure prevented him from receiving a fair trial because if he had access to the NIBIN report before trial, he would have pursued a different trial strategy. At trial, Thomas argued that J.G. and T.G. fabricated the shooting, emphasizing the strange placement of the shell casings, the lack of other 911 calls reporting the shooting, the lack of damage to surrounding cars, and inconsistencies in J.G.'s description of the shooting. But Thomas also argued that, even if there had been a shooting, other evidence showed that J.G.'s account was not accurate. And after the State disclosed the 2023 NIBIN report, Thomas expressly suggested that Freeman might have been the shooter.

**{¶41}** On appeal, Thomas argues that it would be more convincing had he not pointed to inconsistencies in the evidence, but instead simply relied on an alternate-suspect defense, stating, "In light of the *Brady* evidence, however, the best strategy would have been to support the fact that a shooting occurred and point to the evidence identifying other possible assailants." But because Thomas had argued in opening that no shooting had occurred, Thomas asserts that he was stuck with the theory that the shooting was fabricated and faced a "Catch-22" that could be "cured only by a mistrial where counsel could make her best arguments on a clean slate."

**{¶42}** Ultimately, because Thomas admitted the NIBIN report and made an alternate-suspect argument, we hold that Thomas was not denied a "fair trial" or the ability to "effectively use" the NIBIN report simply because he asserts on appeal that there was a "better" strategy. His trial strategy encompassed an alternate-suspect

11

theory. He pointed to issues with the State's evidence and argued those inconsistencies created reasonable doubt. On appeal, Thomas offers a more narrative-driven defense. But we cannot say that Thomas was denied a fair trial because his trial counsel might have pursued a different strategy or that the newly-proposed strategy is so superior that Thomas's uses of the NIBIN report at trial was not "effective." Under *Iacona*'s "fair trial" standard, we hold that the State's late disclosure of the NIBIN report did not violate Thomas's due-process rights. We overrule the first assignment of error.

### B. Second Assignment of Error

**{¶43}** Thomas's second assignment of error asserts that he received ineffective assistance of counsel because his trial attorney failed to (1) pursue DNA testing of the five casings recovered from the Durrell shooting, (2) investigate and present evidence about potential connections between R.C.'s nephew, Freeman, KJ, and Hunter, and (3) properly advocate for a mistrial.

#### 1. *Ineffective-assistance-of-counsel claims*

**{¶44}** A defendant is entitled to the effective assistance of counsel under both the Sixth Amendment to the United States Constitution and Article 1, Section 10 of the Ohio Constitution. *State v. Collins*, 2024-Ohio-5112, ¶ 68 (1st Dist.). To prevail on an ineffective-assistance-of-counsel claim, a defendant must show "both that their counsel's performance was deficient, and that had counsel been effective, the outcome of the proceedings would have been different." *State v. Hurt*, 2024-Ohio-3115, ¶ 81 (1st Dist.). A licensed attorney is presumed to be competent, and a defendant bears the burden of establishing that counsel's performance was incompetent. *Id.*

#### 2. *Thomas relies on arguments outside the record*

**{¶45}** The first and second contentions upon which Thomas bases his ineffective-assistance-of-counsel claims are that his trial counsel should have pursued

DNA testing and investigated potential alternate suspects.

**{¶46}** Both arguments fail on this direct appeal because Thomas can only speculate about the results of DNA testing and an unperformed investigation. Any such results are not in the record, so we cannot know if Thomas was prejudiced. As this court has explained, ineffective-assistance claims that depend on evidence not in the record are not proper for direct appeal; rather, such claims are "better suited for proceedings where that evidence can be introduced, such as a petition for postconviction relief under R.C. 2953.21 or a motion for a new trial under Crim.R. 33." *Collins*, 2024-Ohio-5112, at ¶ 73 (1st Dist.), quoting *State v. Blanton*, 2022-Ohio-3985, ¶ 41. Claims alleging that trial counsel's performance was ineffective because of counsel's failure to present evidence "truly depend on evidence outside the trial record." *Collins* at ¶ 73.

**{¶47}** Here, the results of the investigations that Thomas asserts should have happened are not in the record. Therefore, we can only speculate about whether these investigations would have yielded exculpatory evidence, and Thomas's arguments fail. *See id.* at ¶ 74; *see also State v. Smith*, 2020-Ohio-4976, ¶ 75 (1st Dist.).

### 3) Failing to properly argue for a mistrial

**{¶48}** Thomas's final argument under his ineffective-assistance claim is that his trial counsel was ineffective for "failing to adequately articulate to the trial court why a continuance was insufficient and a mistrial was the only remedy." Thomas's counsel moved for a mistrial and suggested that he might not have waived a jury trial had he had access to the NIBIN report earlier. The trial court denied his motion "without prejudice."

**{¶49}** As explained below, the trial court did not abuse its discretion in denying Thomas's request for a mistrial. While Thomas argues on appeal that the

13

delayed disclosure of the NIBIN report prevented him from making what he characterizes as his "best argument regarding alternate suspects," this amounts to a disagreement with trial counsel's defense strategy. A trial attorney's "theory of the case is an essential part of his/her trial strategy." *State v. Lunguy*, 2008-Ohio-2922, ¶ 14 (3d Dist.). "Trial counsel's strategy at trial, even if 'questionable' or 'if, in hindsight, it looks as if a better strategy had been available,' does not support a claim of ineffective assistance of counsel." *State v. Hughkeith*, 2023-Ohio-1217, ¶ 103 (8th Dist.), quoting *State v. Henderson*, 2018-Ohio-2816, ¶ 71 (7th Dist.).

{¶50} Thomas asserts that the better trial strategy would have been arguing exclusively that someone else was the shooter. Whether Thomas's new proposed theory of the case is superior to the one used at trial, which included an alternate-suspect theory, is not grounds for an ineffective-assistance-of-counsel claim.

{¶51} We overrule Thomas's second assignment of error.

### C. Third Assignment of Error

{¶52} Thomas argues in his third assignment of error that the trial court abused its discretion by denying his request for a mistrial.

{¶53} We review a trial court's ruling on a motion for a mistrial for an abuse of discretion. *State v. Abdalla*, 2023-Ohio-1054, ¶ 10 (1st Dist.). A trial court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably. *Id.*, citing *Pembaur v. Leis*, 1 Ohio St.3d 89, 91 (1982).

#### 1) Courts should order mistrials with caution

{¶54} Crim.R. 16 governs discovery in criminal cases and grants trial courts "considerable tools available to handle discovery violations, including the granting of continuances and mistrials." *State v. Brown*, 2024-Ohio-749, ¶ 36; *see* Crim.R. 16(L)(1). The criminal rules exist to remove gamesmanship in trials and to "'prevent

14

surprise and the secreting of evidence favorable to one party.'" *State v. Darmond*, 2013-Ohio-966, ¶ 19, quoting *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987). Relevant here, the State has a duty to disclose to the defendant the results "of physical or mental examinations, experiments or scientific tests." Crim.R. 16(B)(4).

**{¶55}** In imposing sanctions for discovery violations, trial courts must balance three factors: whether (1) the State willfully failed to disclose evidence in violation of Crim.R. 16; (2) the defendant, in preparing for trial, would have benefitted from knowing about the material; and (3) the nondisclosure prejudiced the defendant. *Darmond* at ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442 (1983), syllabus. The trial court must consider the circumstances surrounding discovery violations and, if it chooses to impose a sanction, "'must impose the least severe sanction that is consistent with the purpose of the rules of discovery.'" *Id.* at ¶ 42, quoting *Lakewood* at paragraph two of the syllabus.

**{¶56}** Moreover, trial courts should not order mistrials lightly. Ordering a mistrial based on errors or irregularities is improper unless those errors or irregularities affect the defendant's substantial rights. *State v. Brown*, 2013-Ohio-2720, ¶ 32 (1st Dist.). A mistrial is proper "only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).

### 2) *The trial court properly refused to grant a mistrial*

**{¶57}** Because the State's failure to disclose was not willful, Thomas had opportunities to use the nondisclosed evidence, and Thomas failed to demonstrate prejudice, the trial court did not abuse its discretion.

a) <u>Was the State's violation of Crim.R. 16 willful?</u>

**{¶58}** To determine whether a discovery violation was willful, courts should consider whether either the prosecuting attorney or law enforcement officers knew

about the material. *State v. Miller*, 1999 Ohio App. LEXIS 3569, *12 (4th Dist. July 27, 1999). Ohio recognizes that law enforcement officers are part of the prosecutorial machinery of the State "and knowledge on the part of a law enforcement officer must be imputed to the state." *State v. Wiles*, 59 Ohio St.3d 71, 78 (1991), quoting *State v. Tomblin*, 3 Ohio App.3d 17, 18 (1st Dist. 1981).

**{¶59}** The trial court found that the State did not willfully violate the criminal rules and that the disclosure was "as prompt as it could have been." Thomas asserts on appeal that the State's disclosure was untimely, arguing that the State should have been aware in late November 2022 that the shell casings recovered in the March 2022 shooting matched the casings recovered from the Durrell shooting. He cites Zopfi's testimony that NIBIN reports are generated within a week after officers recover shell casings. While the State appears to concede that the report should have been available within that time frame, there was no explicit testimony that a NIBIN report was, in fact, generated within that week or at any point before trial.

**{¶60}** Though Thomas may have demonstrated that the State negligently failed to disclose the NIBIN match, he cannot establish a willful violation of Crim.R. 16 on this record. This factor weighs against granting a mistrial.

b) <u>Would Thomas have benefitted from timely disclosure of the NIBIN report and was he prejudiced by the untimely disclosure?</u>

**{¶61}** Thomas's arguments on, and the trial court's treatment of, the final two *Darmond* factors are closely related. The trial court stated that it did not believe knowledge of the undisclosed material would have benefitted Thomas, though it hedged, "It certainly could have. And I think there is some prejudice, but I don't think it rises to the state that a mistrial is warranted."

16

**{¶62}** On appeal, Thomas asserts that the trial court should have granted his motion for a mistrial because his trial strategy would have been different if he had access to the NIBIN report before trial. Thomas repeats his arguments raised under his *Brady* claim—that he was faced with a "Catch-22" in which he was "locked in" to his primary defense theory that T.G. and J.G. fabricated the shooting. Thomas notes that this argument was inconsistent with the NIBIN report and, in light of the NIBIN report, "the best strategy" would have been to argue that someone else shot at the victims. Thomas argues, because the NIBIN report was not disclosed until just before the end of trial, it was too late for him to switch trial strategies, which prejudiced him.

**{¶63}** Initially, Thomas did advance an alternate-suspect theory at trial. And importantly, when requesting a mistrial order below, Thomas did not argue that he would have pursued a different trial strategy had the NIBIN report been disclosed earlier. Instead, Thomas argued that he had had insufficient time to investigate an individual identified in the NIBIN report. The closest Thomas came to arguing that he would have pursued a different theory if he had access to the NIBIN report before trial was a statement that the right to effective assistance, a fair trial, and due process mean "having all of the necessary information available to him in order to make knowing, intelligent, and voluntary decisions about how he wants to handle his case."

**{¶64}** Despite this general reference, Thomas did not argue that he would have pursued a different trial strategy if he had the NIBIN report before trial. Because Thomas never made this argument below, the trial court could not have abused its discretion in denying Thomas's motion for a mistrial and instead granting Thomas a three-month continuance. The trial court's remedies, consisting of a lengthy continuance and permitting Thomas to reopen his case, were reasonable means of mitigating any prejudice.

**{¶65}** Thomas also argues that the trial court should have ordered a mistrial because he was prevented from questioning law enforcement about the thoroughness of the investigation under *Kyles v. Whitley*, 514 U.S. 419, 446 (1995). But the trial court allowed Thomas to reopen his case, and Thomas impeached Zopfi regarding the thoroughness of the investigation. And nothing stopped Thomas from recalling the other officers to impeach their testimony.

**{¶66}** Finally, Thomas argues that, had the State disclosed the NIBIN report before trial, he would have opted for a jury trial. Below, Thomas stated, "As the court is aware, the waiver of a jury trial has to be done knowingly, intelligently and voluntarily. And certainly it is a strong possibility that Mr. Thomas would have not waived the jury trial had this information been available to him at an earlier time." But Thomas did not expressly move to withdraw his jury waiver.

**{¶67}** The Supreme Court of Ohio considered a similar argument in *Wickline*, 50 Ohio St.3d at 117. In *Wickline*, during trial, the defendant learned about undisclosed exculpatory evidence. *Id.* at 116. Though the trial court denied a mistrial, it allowed the defendant to introduce the untimely evidence. *Id.* On appeal, after rejecting the defendant's *Brady* and Crim.R. 16 arguments, the Court addressed the defendant's argument that, had the evidence been disclosed before trial, he would not have waived his right to a jury:

> Appellant argues that he was denied the opportunity to make an "informed choice" between being tried by a panel or by a jury. Therefore, appellant asks us to grant a new trial. However, at oral argument before this court, appellant stated that even if he had elected to be tried by a jury and the Blendon records were discovered at trial, nevertheless, prejudicial error would have occurred. In effect, appellant is asking this

18

court to hold that under any circumstance, mid-trial discovery of evidence is prejudicial error. This is so because the decision between being tried before a panel or a jury is naturally made prior to any mid-trial discovery. Thus, an argument could be made at every trial that the choice between panel and jury would have been different had the mid-trial discovery been available before trial. Therefore, appellant's "informed choice" argument is not premised on his waiver of trial by jury but, rather, brings us back to the contentions regarding *Brady*, supra, and Crim. R. 16 that we have just rejected.

*Id.* at 117; *see State v. Vale*, 2023-Ohio-4287, ¶ 20 (10th Dist.).

**{¶68}** *Wickline* treated the "informed choice" argument as being coterminous with a *Brady* or discovery-violation argument. Based on *Wickline*, we must reject this argument as well.

**{¶69}** We overrule Thomas's third assignment of error.

### D. Fourth Assignment of Error

**{¶70}** In his final assignment of error, Thomas argues that his convictions are against the manifest weight of the evidence as the State failed to prove that he was the shooter in the maroon Ford.

#### 1. Manifest-weight-of-the-evidence standard

**{¶71}** Under a manifest-weight-of-the-evidence challenge, a defendant argues that the State failed to meet its burden of persuasion at trial. *Hurt*, 2024-Ohio-3115, at ¶ 95 (1st Dist.). An appellate court "must 'independently "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice."'" *Id.*, quoting *State v. Kizilkaya*, 2023-Ohio-3989, ¶ 15 (1st Dist.), quoting *State v. Powell*,

2020-Ohio-4283, ¶ 16 (1st Dist.).

{¶72} A manifest-weight challenge permits an appellate court, sitting as a thirteenth juror, to disagree with the factfinder's resolution of conflicting evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *Id.*, quoting *Black's Law Dictionary* (6th Ed. 1990). An appellate court should only order a new trial based on the manifest weight of the evidence "'in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.* at 387-388, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶73} Though appellate courts must independently weigh the evidence in applying a manifest-weight analysis, the Supreme Court of Ohio has instructed that appellate courts "'must always be mindful of the presumption in favor of the finder of fact.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 14, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21. This is because the factfinder personally observes the witnesses when making credibility determinations. *Id.* Accordingly, appellate courts resolve conflicting evidence in a manner consistent with the trial court's judgment. *State v. Rose*, 2024-Ohio-5689, ¶ 23 (1st Dist.).

{¶74} Several factors may assist an appellate court in reviewing a manifest-weight challenge: (1) whether the evidence was disputed, (2) key witness impeachment, (3) what the evidence fails to establish, (4) the evidence's reliability, (5) witness impartiality, and (6) if the evidence is vague or conflicting. *Id.* at ¶ 24, quoting *State v. Barnes*, 2017-Ohio-383, ¶ 15 (8th Dist.), quoting *State v. Clark*, 101 Ohio App.3d 389, 408 (8th Dist. 1995).

## 2. J.G.'s statements were conflicting

**{¶75}** Thomas's manifest-weight argument primarily relies on inconsistencies between J.G.'s trial testimony and her statements to police immediately following the shooting. Thomas notes that the bodycam footage showed that, on the night of the shooting, J.G. suggested that she never actually saw Thomas driving the maroon Ford. Thomas points to these statements, the responding officers' statements to J.G. that "it could be him, or it could be someone who has access to that car," and J.G.'s statements the following day that she saw Thomas roll his window down. Thomas also points out that, despite multiple officers speaking with J.G. the next day, there is no bodycam footage. Thomas argues that J.G.'s trial testimony and statement that Thomas rolled the window down are unbelievable considering the inconsistencies, and that his convictions were contrary to the manifest weight of the evidence.

**{¶76}** We agree with Thomas that J.G.'s trial testimony and her statements to officers the day after the shooting and at trial were inconsistent. The night of the shooting, J.G. said "the only reason [she] knew it was [Thomas] was because it was the car he would drive."

**{¶77}** But if we excised J.G.'s inconsistent testimony, the remaining evidence showed that (1) Thomas had a heated argument with J.G. earlier in the day; (2) Thomas had driven away from the argument in the maroon Ford Focus hours before the shooting and said, "It's on now"; and (3) the shooter was driving R.C.'s maroon Ford Focus. The remaining evidence convinces us that this is not the exceptional case warranting reversal.

**{¶78}** We overrule Thomas's fourth assignment of error.

### III.    Conclusion

**{¶79}** We overrule Thomas's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**KINSLEY, P.J.,** and **ZAYAS, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.