[Cite as *State v. Miller*, 2025-Ohio-5825.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| STATE OF OHIO | COURT OF APPEALS NOS. {48}L-24-1168 |
| | {48}L-24-1182 |
| APPELLANT/CROSS-APPELLEE | {48}L-24-1183 |
| | |
| V. | TRIAL COURT NO. CR0202301515 |
| | |
| DOUG MILLER, ET AL., | |
| | |
| APPELLEES/CROSS-APPELLANTS | |

**DECISION AND JUDGMENT**

Decided:  December 30, 2025

* * * * *

Dave Yost, Ohio Attorney General, and
Drew Wood, Special Prosecuting Attorney, for appellant/
cross-appellee

Diane Menashe and James Pfeiffer, for appellee, Doug Miller

David Axelrod and Alia Kadri, for appellee, Brad Konerman

Richard Kerger, for appellee/cross-appellant, James Delverne

Norman Abood, for appellee/cross-appellant, Adam Salon

* * * * *

**SULEK, P.J.**

{¶ 1} In this consolidated appeal, appellant, the State of Ohio, appeals from the

June 14, 2024 judgment of the Lucas County Court of Common Pleas granting the

motions of appellees Doug Miller, Brad Konerman, Adam Salon, and James DelVerne for sanctions and ordering the State to pay $156,225 in attorneys' fees. In granting the motions for sanctions, the trial court found that the State committed discovery violations pertaining to its handling of the voluminous electronic discovery in its criminal prosecution of appellees.

{¶ 2} In addition to the State's appeal, Salon cross-appeals, challenging the amount of the attorneys' fees awarded and asserting that the trial court erred in not dismissing the indictment with prejudice. DelVerne also cross-appeals, arguing that the trial court violated his due process rights when it permitted the State to voluntarily dismiss the case and re-file it against him.

{¶ 3} For the following reasons, the trial court erred in its interpretation of the discovery requirements of Crim.R. 16, and the court abused its discretion when it found that the State committed a discovery violation. The judgment of the Lucas County Court of Common Pleas is reversed and vacated.

## I. Background

{¶ 4} On April 6, 2023, the State, represented by the Ohio Attorney General's office and following an investigation by the Division of Securities ("Division"), filed notice of an 106-count indictment from the Lucas County Grand Jury charging appellees,[1] many of whom worked for a Toledo, Ohio investment firm called Northwest

---

[1] In addition to appellees, the indictment charged Colleen Hall, Gary Rathbun, Nancy Rathbun, and John T. Walters, but they have not participated in this appeal.

2.

Capital Management, with several financial- and securities-related felonies, including money laundering, aggravated theft, unlawful securities practices, and engaging in a pattern of corrupt activity. Not all were charged under each count. According to the indictment, various financial schemes and practices conducted by appellees between 2010 and 2022 resulted in the loss of several million dollars from investors.

{¶ 5} Appellees entered pleas of not guilty, and the trial court held several pretrials concerning discovery, most on the record. Each pretrial primarily concerned the format of the voluminous electronic discovery produced by the State, which appellees contended was unusable throughout the fourteen months that the case was pending. The discovery dispute culminated in a hearing in April and June 2024, following which the trial court granted appellees' motions for sanctions, ordered the State to pay a portion of appellees' attorney's fees, and granted the State's motion to dismiss without prejudice pursuant to Crim.R. 48(A).

**A. The Pretrials**

{¶ 6} On July 18, 2023, at one of the earliest pretrials, the parties discussed the volume of the State's discovery productions. The State described what it had produced so far:

> The first item . . . was the portable hard drive that had 338 boxes of documents obtained from the search warrant at Northwest Capital.
> We also have the 338 boxes that are available if anyone wants to look through the 338 boxes. They are in Columbus, but we would move them to Toledo -- to an area that is more suitable.
> Also on that portable hard drive . . . was the digital data from the same search warrant and that was the hard drive that, you know, you

3.

needed -- you needed a data management system to input the information, the data management system to organize it, and to search it. You simply can't search it with Adobe.

Indices have been provided for that information. They were e-mailed out. They're rather lengthy. They are searchable. . . . [O]ther people at the Division went through the indices and highlighted victim's names, subscription agreements. Subscription agreement would be a key piece of evidence in this case, highlighted those so that Defense Counsel can easily find those.

Second, Your Honor, on . . . June 30, 2023, flash drive was provided to the Defense Counsel containing investigation files of the Division.

So everything except something that's work product was provided. When it was provided it was Bate[s] numbered, and when it is Bate[s] numbered the file tree is removed because it is the most efficient way to Bate[s] number it -- to Bate[s] number it and provide it. But we also provided the same information later on, in fact today, on these external hard drives. Not Bate[s] stamped or Bate[s] numbered, and you would have the same file trees, same folders that the Division of Securities used when this case was indicted and are still using.

In addition there was an index of that provided as well this morning by me in an e-mail . . . showing the file trees, the folders, the names under the folders, and so that can be searched that way.

In addition, Your Honor, when we presented this case to a Grand Jury, we had -- we had exhibits that we used, the exhibits that we used that we believe inculpate each Defendant. Those exhibits have also been provided to the Defense Counsel.

What we have done was we had six groups of crimes we call them, and five of them were finished at the time of indictment.

Each -- within each group whether there was an issue or crime or a direct investor crime we had exhibits for each person that was -- that was found in the group.

Those exhibits have been provided, and those exhibits are bank records, results from Rule 23 hearings. Rule 23 hearing is a hearing -- is a process the Division of Securities has where they can subpoena a person to a hearing and under oath, under penalty of perjury, question the person. . . .

So we provide the exhibits that we believe inculpate the -- each particular Defendant for each count they are charged with.

We've also provided BCI digital copies of servers, laptops, and from the search at Northwest Capital that's not Bate[s] stamped.

So there's a file tree and folders for that data, and that was provided on a portable hard drive on or about the 10th of September (sic).

4.

The 338 boxes of documents described by the State would later become central to the discovery issues between the parties. Those documents, which were hard-copy documents that had been seized from Northwest Capital, were labeled by the State as the SNWC Production. The SNWC Production was just one of several productions made by the State in 2023.

{¶ 7} During the July pretrial, Konerman's defense counsel indicated that the indices were not linked to the documents, so one would have to look at the index and then go to the document. He stated that without a document management system, and without the ability to search across all different databases, it would be cumbersome and difficult to prepare a defense. The parties discussed using a platform called Relativity, which the State estimated would cost $4,500 per month for one user that could be split between the defendants. Appellees did not agree to do so, with one appellee's counsel contending that work-product confidentiality could not be maintained while sharing a database intended for a single user. Another appellee's counsel admitted that the indices were somewhat helpful in that they did "direct you to some of the things with maybe a little more effort than would be preferable, but you can get there." But he stated that they "do[n't] solve the real problem," which he claimed was his inability to search through all two million documents produced by the State to identify any exculpatory evidence "without having to pay a lot of money." He posited that appellees should not have to "pay anything to figure out what it is the government … has by way of evidence against [them]."

5.

{¶ 8} The trial court instructed the State to begin to produce an exhibit list showing the evidence on which it was relying for each count, and to produce the discovery in a way that was usable for appellees' counsel. The court also expressed concern regarding the time appellees would need to review the discovery and the cost of a discovery platform, questioning whether "someone [was] at jeopardy [of] being convicted of something because they didn't have the financial ability to sort the documents in discovery that is provided to them," though the court also clarified, "I don't know the financial status of anybody in this room…" The court impressed that it was "considering indicating to the State that if it has to be in a searchable format, a useable format, that the State has to pay for it."

{¶ 9} Following the July pretrial, some of the appellees filed motions to compel discovery. At a pretrial on August 8, 2023, the trial court reviewed appellees' grounds for their motions to compel. The State explained that it had provided the list of exhibits it would use to prosecute counts 1 through 56 and would be working on the remaining counts. In addition, the State created additional spreadsheets listing every document seized from Northwest Capital with file paths for each document to assist appellees in finding important documents stored on their portable hard drives. The State noted that the spreadsheet "was filtered to the victims' index which has a victim's name, let's say [R.K.] and the files that are associated with [R.K.] that we seized and you can see that we discussed how this was created and what the meaning of these lines are and how you can

6.

take the folder path from a particular line, put it in one of the databases that we provided. It's the 338 box database. And call up the document."

{¶ 10} The State also asserted that the PDFs of the SNWC Production had been scanned and processed for optical character recognition (OCR) and therefore were mostly searchable. The State attempted to show a sample search of one of appellees' names on the State's copy of the hard drive, but the search took nearly an hour.

{¶ 11} The trial court again expressed concern with the timing of discovery, pointing out that the case had already been pending for four months, discovery had not progressed, and it had timelines for cases imposed by the Ohio Supreme Court under the Ohio Rules of Superintendence. The court also noted that any failure of the State to comply with Crim.R. 16 was not due to a lack of attention to discovery but instead would be due to the State's failure to provide usable discovery. The court stated that although the appellees' motion to compel did not seek such an order, it had the authority under Crim.R. 16(L) to order the State to pay for a discovery platform that would be searchable.

{¶ 12} The State, in response to the trial court's concerns, stated that the discovery includes the Division's investigative file, which has file trees and is sorted by subject. The State explained,

> Everything's arranged in a logical manner and we had a speaking indictment that did go quite a bit in depth about things that were being alleged. . . . [T]his isn't a pure documents case. There were hearings that were held and we've got contents of those hearings that are in the investigative file, that would be, you know, reviewed and listened to. And there's no optical character recognition that needs to be done with those. That's just sitting around and listening to them.

7.

And so I don't think that the idea that we provided something that's wholly unusable is necessarily true.

The State suggested that it could re-process the documents for optical character recognition—which it believed that its discovery vendor had already done—resulting in side-by-side hard drives: one containing the investigative files with their file trees, and the other containing searchable documents with Bates numbers, but not file trees. Essentially, the State would simply upgrade the already existing discovery production so that the hard drive with the Bates numbers would be searchable for content. The State said that

> would give them the investigative files the exact same way that the division has them, the exact same way that I'm looking at them when I'm at home on my computer. You know, I've got my laptop and I've got my hard drive.
> So I think that would -- that version with the one time expense would check off the boxes of giving the defense something that's searchable and something that's useable and give them two different directions to come at the data. If they're saying I just want to look at all of the bank records, we can go into the investigative file and see the file trees that lead to bank records. Say I want to find certain person's name, go for the other version and search that person's name. And I think that would be very usable.

{¶ 13} Appellees' counsel took issue with the time required to perform a search of the hard drives, asserting that conducting searches often caused their computers to crash, and contending that some of the documents were not searchable. They asserted that using a document review platform was the only way they could effectively search the documents. They also maintained that they would need to start their searches over after

8.

the State provided entirely searchable documents, and thus continuing to search the documents before that happened would be a waste of their time.

{¶ 14} The court then solicited from defense counsel motions to compel seeking an order for the State to provide a document review platform.[2] In anticipation of those motions, the State requested, and defense counsel agreed, that it be permitted to delay re-processing the documents for OCR to avoid an unnecessary expense in the event that the court would order it to provide a document review platform. The court assented and set deadlines for briefing on motions to compel.

{¶ 15} Following the pretrial, additional appellees filed motions to compel. Appellee Miller's motion to compel asked the trial court to order the State to produce the discovery through a document review platform at the State's expense. In the motion, Miller asserted that while the State had provided a drive containing "hundreds of thousands of pages of raw data (whether that be load-files, OCR'd PDF documents, scanned PDFS without OCR, or native files)," it failed to provide any mechanism to search those documents, and when Miller's counsel had attempted to search the documents using a regular finder window, the hard drive would crash. Accordingly, Miller contended that his counsel could not meaningfully review the discovery.

---

[2] The trial court stated, "Here's kind of what I've hinted at in last hearing. A lot of this type of activity is being driven by myself in the management of the case. I finally -- mention this -- I find that [Rathbun's counsel's] motion to compel and it starts to delve into this issue and it starts to talk about the usability of the discovery, things like that, searchability. However, I don't have what you just articulated in any form of a written motion to the court that I can jump on. I can only give so many hints, clues that I'm working on the court's management position on the case."

9.

{¶ 16} The next pretrial was held on September 19, 2023.  At that pretrial, the State asserted that it believed discovery was complete, stating,

> We've turned over the documents to the Defense in the same form that we possess them.
>
> I personally have copies of them.  I possess the same hard drive that was turned over to the defense attorneys, same drive that was turned over to the defense attorneys, same USB drive, disks for supplemental discovery. Basically the same everything.
>
> The Defense has it in exactly the same form that the State has it.  We have expressed to Defense Counsel if they want to view the physical boxes instead of the scanned copies of the documents we will make them available.  They can either come down to Columbus to where they are now, or we will have them transported to Toledo so they will be more convenient.

{¶ 17} Miller's counsel, in support of her motion to compel, told the court, "Trust me that when I filed the motion I got several calls from higher ups about our position that the State should pay for a platform, i.e., such as Relativity, and that that's never been done in the history of criminal litigation, and sort of it was a wild ask."  Miller's counsel maintained, however, that she could not meaningfully review the discovery without such a platform.  Konerman's counsel asserted that he was defense counsel for a federal criminal case in which the government agreed to provide access to a platform at the government rate.  Not all appellees, however, sought a State-funded document review platform at that time.  Nancy Rathbun's counsel asked instead for the State to OCR the documents, explaining that he had his own indexing software and other platforms available to review the discovery.

10.

{¶ 18} The State responded, justifying its position that it had completed discovery:

Here we have the exact same data the State has in the exact same form turned over to Defense Counsel more than six months ahead of time.

We also have indexes that have been provided to Defense Counsel. We are providing exhibit lists on a rolling basis. I believe since the last meeting we had in the courtroom the State has provided a road map of documents to Defense Counsel matching up incriminating documents to each and every charge that will exist in the indictment to assist Defense Counsel in finding those documents and reviewing them.

We've provided file trees so Defense Counsel can go directly to that location, not just the name of the exhibit or description, but here's where you find it on your hard drive.

And I know we did that because I did that personally.

And when I personally did that I used the same hard drives that have been provided to Defense Counsel. I opened the files on my computer. I looked at them, physically reviewed them. I saw what the Bates number was. I saved them to another location, because I was preparing my trial exhibits for trial, and I wanted them easily accessible in one folder sorted by victim name and sorted by charge.

And, frankly, the drives are useable. I didn't run into any obstacle about that.

. . .

None of the Defense Counsels' drives have had catastrophic failures. Nobody is saying that. There has been no problem with what was given to them.

{¶ 19} Counsel for one of the appellees acknowledged that, for the less than 500 exhibits that the State intended to use at trial, counsel could click on a link on the exhibit list to access the corresponding document. Counsel, however, expressed reservation about the universe of the "other two million" pages, contending that universe could not be meaningfully accessed for review.

{¶ 20} The trial court continued to express concern with the time that the case was taking, reminding the parties of the six-month timeline for trial court cases set by the Ohio Supreme Court. The court stated, "What is seriously on the table is the court

11.

ordering the state to put it on a platform, whatever the platform is, at the state's expense to load it." The court directed the parties to discuss solutions and come to an agreement by September 27, 2023, and if they did not, the court stated that it would enter an order.

{¶ 21} On October 10, 2023, the trial court conducted another pretrial, during which the State informed the court that it had agreed to upload the data on Relativity, a document review platform, for three months. The State said that the cost of doing so was $52,100, the State would pay for it, and it was in the process of getting approval for the payment. The trial court issued an order the next day that stated as follows:

> STATE OF OHIO to confirm the finances for the exchange of discovery no later than NOVEMBER 30, 2023 and a deadline of JANUARY 8, 2024 for training to be complete and all discovery to be made accessible for all counsel. Bond is continued.

{¶ 22} The State, at the November 28, 2023 pretrial, informed the trial court that it had gotten approval to pay for Relativity. The court again reminded the parties of the timelines for trial court dockets, stating that the Ohio Supreme Court had agreed to permit this case to extend more than six months but suggesting that the Ohio Supreme Court may not continue to give the court extensions. The trial court acknowledged that "[d]iscovery was delivered long ago [by the State] by way of hard drive," but the court said that it "did not accept that [the hard drive] was actually useable." The trial court's focus was the extent to which the data was searchable, and it was satisfied that hosting the data on the Relativity platform would render the discovery "useable." Having agreed that the State would provide the Relativity platform, the parties discussed having a single contact point for technical assistance, and they also discussed the dates when appellees'

12.

counsel could be trained on using Relativity, with the parties agreeing on two dates in early January, after Relativity went live.

{¶ 23} The next pretrial was held on January 30, 2024, after Relativity had gone live and the training dates occurred. That pretrial largely concerned the technical difficulties that appellees were experiencing with Relativity and a motion to compel filed by Salon. Salon's counsel maintained that not all the larger documents had been processed for OCR before they were loaded into Relativity and therefore those documents did not appear in searches conducted in Relativity. Salon also asserted that several portions of longer documents were missing and no native formats had been uploaded into Relativity. Counsel for other appellees asserted that they experienced similar issues as Salon's counsel. Salon's counsel conceded that he had not contacted technical support to resolve his issues, but Miller's counsel pointed out that appellees were charged at an hourly rate for using technical support.

{¶ 24} Miller's counsel also asserted that she discovered that not all the documents were searchable during the training conducted by the State's vendor in early January and that she later discovered that she was unable to download larger documents from Relativity. She raised these issues in an e-mail to the trial court, which was also sent to the State, on January 16, 2024, but the issues persisted.

{¶ 25} In response, the State maintained that it also experienced some of the same problems as appellees in its own searches using Everlaw, the document review platform used by the State. The State also expressed surprise that not all documents had been

13.

processed for OCR.  The court said that the State still had time to fix these issues, instructing it to do so.

{¶ 26} At the March 5, 2024 pretrial, however, the issues remained.  Appellees again maintained that not all the documents had been processed for OCR, native files were missing, and the version of Relativity provided by the State was the "barest bone" version and some of their problems with their searches would be resolved if the State had provided a better version of Relativity.  The State responded,

> Judge, I think the main problem is that what everybody wants out of Optical Character Recognition is more than the technology can provide. What everybody seems to be asking is for a --- a technology that has the reading ability of a human to recognize characters and to make them computer searchable.
> And from our conversations with the vendor that's just not possible. Documents are going to come in different quality, different resolutions, and when that happens sometimes Optical Character Recognition software just cannot fully scan the documents.
> It's just a limitation of the technology.

The trial court dismissed the State's explanation, stating,

> [I]n my reading of the discovery rules and what needs to be turned over, it doesn't say that subject to the limitations of discovery -- or of technology.  It needs to be turned over to have a fairness to understand the allegations against their client.
> So if 2.2 million documents can't be turned over in a format that is useable to the Defense, and it's because it's technology, that's not a viable excuse for the State to stand on.
> I have to make sure that both sides of this case have access to the same information and understand what the allegations are against each of the individual Defendants.  That's my problem.

{¶ 27} In addition, the State asserted that it had not had time or sufficient information regarding the problems to fix all of them, having only learned of the search issues as of the January 30 pretrial and appellees had not given details about their search issues to technical support. It relayed that its vendor managing Relativity reported that it had only received two technical support calls, and one of them sought assistance with obtaining login credentials. The State also pointed out that similar federal cases involving significant discovery take a year for discovery to be complete.

{¶ 28} The trial court noted, however, that the case was eleven months old and therefore overage. It also commented that the $50,000 the attorney general's office spent for Relativity was only a small fraction of the attorney general's budget, and it stated that it was considering dismissing the indictment without prejudice under Crim.R. 48(B). The court scheduled a hearing to be held on the issue.

{¶ 29} In late March, the State held a meeting with appellees' counsel and representatives from its Relativity vendor, Novitas, to get more information about the issues that appellees had experienced while using Relativity. During the meeting, appellees' counsel provided several dates and times when they experienced slow searches. Miller's counsel maintained that she had significant prior experience with Relativity and it had never been this slow in the past. When the State attempted to replicate the searches during the meeting, however, the searches worked quickly. Novitas employees maintained that they could not discover the cause of slow searches unless they investigated them at the time they occurred. Miller's counsel complained that

15.

she often did her searching late at night and technical support may not be available at that time. Also during the meeting, the State informed appellees that it had discovered that the entirety of the SNWC Production had not been processed for OCR and therefore it was not searchable. The State told appellees that it planned to fix that problem by the end of March.

**B. The Hearing on Appellees' Motions to Compel**

{¶ 30} Before the April 29, 2024 hearing, appellees filed motions to compel seeking dismissal of the indictment, most without prejudice, though some sought dismissal with prejudice. During the hearing, the State provided more information about its discovery that the SNWC Production had not been searchable. The State explained that it learned in conversations with its discovery vendor sometime around March 21 that the vendor mistakenly uploaded the documents from the SNWC Production into Relativity as images rather than searchable PDFs, rendering the documents unsearchable in Relativity. The State pointed out that the SNWC Production was just one dataset uploaded to Relativity and the other data sets were searchable. According to the State, the SNWC Production, which consisted of 838,000 pages, had been properly processed and uploaded into Relativity as of March 30, 2024. The State maintained that none of the appellees had ever given the State sufficient detail about the search errors to allow the State to determine the cause of the errors, and instead the State discovered the cause on its own on March 21.

16.

{¶ 31} Several witnesses testified at the hearing. Patty Loo, a paralegal for Konerman's counsel, testified to her experience attempting to search the State's productions in Relativity. Loo, who had seven or eight years of experience working in Relativity daily or weekly, testified that in January, her search results were not consistent. Documents that contained the search term would be missing from the results and documents that did not have the term would appear in the search results. She also noted that metadata was incomplete or missing for several documents, exporting documents from Relativity would take much longer than her typical experience, and she would often have to repeat the exporting process to obtain native documents. In addition, several tools offered by Relativity, such as persistent term highlighting, which allows a user to find the places in a document where a search term was found, and artificial intelligence, which permits Relativity to learn which documents are more relevant for a user, had not been turned on. Loo testified that these tools would shorten the time needed to review such a large volume of documents. Once Loo discovered that searches in Relativity were unreliable, Loo stopped attempting to review the discovery.

{¶ 32} Loo also testified that Harvey McCleskey, an investigator working for the State, reached out to ask her about the issues she experienced with Relativity following the January pretrial. She told McCleskey that she "thought he should have a conversation with his vendor. They needed to OCR the documents and rebuild the index." She said that McCleskey followed up with an e-mail asking for more details. Loo did not respond to him directly. Instead, she drafted a response that she sent to Konerman's attorney,

17.

explaining that it was not her role as a paralegal to communicate directly with the State, and she did not know if the attorney ever forwarded her response to McCleskey. Loo also admitted that she had never contacted technical support about her issues and instead only communicated them to her team at her law firm. When asked whether her issues were ever explained to the State, she said, "I think it was definitely explained more broadly, but not with specificity to a particular document."

{¶ 33} Loo further testified that she was aware that the State had processed a significant portion of the documents for OCR in late March, but she continued to face many of the same issues even after that. She conceded that her searches were getting consistent results since the State's additional processing of the documents in March, but Loo still did not feel confident that her search results were accurate because of the many errors she encountered in the platform.

{¶ 34} Natalie Bargy, who was the e-discovery manager for Konerman's counsel's law firm and who worked with Loo, also testified. Bargy, the Relativity administrator for the firm, had significant experience processing data and uploading it into Relativity as well as troubleshooting in Relativity for the firm's other cases, and she was qualified as an expert on Relativity. Bargy testified that Loo brought to her the following issues with the platform in this case: inconsistent searching, lack of OCR, missing native documents, and documents failing to load. Bargy also testified that issues remained after the State's vendor processed the documents from the SNWC Production and reloaded them into Relativity. She opined that the inconsistent search results were the result of OCR not

18.

reading correctly, resulting in documents with garbled or missing text as well as 2000 documents that remained, even after reprocessing, with no connected text. She also noted other processing errors in the documents, with native documents not being produced with slip sheets, missing metadata in some documents, and extensively long search times, resulting in a "wheel of death." Based on the remaining issues, she opined that the State's vendor was not competent at processing documents for upload into Relativity and that the data needed to be properly processed and loaded back into Relativity, which would take about 15 days. She estimated that the defense would then need six to nine months to review the discovery.

{¶ 35} On cross-examination, Bargy admitted that she had never attempted to upload onto Relativity the data on the hard drives originally produced by the State. She also agreed that when she troubleshoots issues with Relativity in cases in which her firm administers the platform, she is most successful in discovering the solution for an issue when the user gives her specific details about the issue so she can replicate it.

{¶ 36} Next, Jamie Adams, an information technology expert for appellees, testified regarding the speed of exporting documents from Relativity. Although he opined that the speed to export files was "reasonable" and "the system was working within parameters," he also testified that the speed to export was inconsistent, which he believed could make a user "reluctant" to use the platform. He thought that the export inconsistency was the result of using a third party to host the data rather than Relativity itself. Adams opined to a reasonable degree of certainty that the platform did not provide

19.

defense with "meaningful, useful, and reliable search of the discovery in this case," but he clarified the accuracy and consistency of the searches and the quality of the OCR processing performed by the State was outside the scope of his opinion.

{¶ 37} Finally, Eric Lang, an e-discovery project coordinator for VRC, a document management company contracted by the State to handle the discovery production in this case, testified. Lang testified about the process that the State used to initially produce the hard drives containing the SNWC Production as well as how Relativity had been coordinated, explaining that VRC subcontracted with another vendor, Novitas, to host and upload the data into Relativity.

{¶ 38} Lang clarified that the hard drives given to each appellee for the SNWC Production had been processed so the data on the drives could be loaded onto a document review platform. He maintained that the hard drives were never intended to be used without such a platform and searching them without a platform "would not be ideal." Lang also described how those hard drives were made, explaining that Novitas was given the digital data in a "raw format" and Novitas then "ingested [the raw data] into Relativity, processed it, made pdf production that were loadable into any other review platform, and we put that on the hard drives and shipped that off to [appellees' counsel]." Lang asserted that the data on the hard drives sent to appellees' counsel was the same data that was uploaded to the discovery review platform used by the State, Everlaw.

{¶ 39} Lang also explained that the documents in the SNWC Production, unlike the rest of the discovery, was originally in hard-copy format, not digital format, so VRC

20.

scanned those documents before giving them to Novitas. Lang did not know that the PDFs from those scans would have to be first processed for OCR before they could be uploaded into Relativity as searchable documents, explaining that he was not familiar with Relativity and in his prior experience other e-discovery programs extracted text from PDFs for searching without the need for OCR processing first. Lang was only ever told that some documents were not appearing in searches but he was not given specifics about which documents. He was never informed that the documents omitted from the search results all came from the SNWC Production. Notably, counsel for the State informed the court that the State's counsel could not go into Relativity to check whether it was working because appellees' counsel requested that the State be precluded from doing so due to work-product confidentiality concerns.

{¶ 40} Lang clarified that the missing metadata referred to in Bargy's and Loo's testimony was the result of the metadata being deleted from one of the State's productions (a production known as the ODOC 01 Production, which was different from the SNWC Production) due to a hosting issue with Novitas,[3] though he maintained that because the ODOC 01 Production was duplicative of documents contained in yet another production, the SBCI Production, all of the metadata for the ODOC 01 Production would

_____

[3] Novitas was hosting the data on behalf of the State while the parties were discussing whether the State would be required to host the data for discovery for the appellees. At some point, the State was informed that Novitas would no longer host the data for free, and the State, believing that it would not be required to host the data, informed Novitas that it could delete the data. Once the State determined it would be hosting the data, Novitas was instructed to cease deleting the data, but the metadata from the ODOC 01 Production was irretrievably lost.

exist in the SBCI Production. Lang also asserted that the hard drives that appellees' counsel received early in the case contained that metadata.

{¶ 41} The hearing was continued until June 3, 2024 for additional arguments, and the State moved to dismiss the indictment without prejudice pursuant to Crim.R. 48(A) in the meantime. On June 3, the State asserted that it planned to seek a re-indictment in the case, intending to separate the counts into several new indictments, organized by the type of conduct, to benefit those appellees who had been charged with fewer counts and to simplify the discovery. The State also provided more information about its plans to correct the issues with Relativity for the re-indictments, including a significantly increased budget of $250,000 to pay for Relativity. Appellees contended that the case had been pending for 15 months and their clients had incurred significant attorneys' fees, which reduced their ability to pay for any future restitution to the victims of the alleged schemes. Appellees also posited that they could not trust the State to provide complete discovery in the future.

{¶ 42} Following the hearing, the parties submitted additional briefing regarding sanctions, and counsel for appellees filed under seal itemized statements of attorneys' fees and expert fees, as applicable.[4]

---

[4] Although Nancy Rathbun's attorneys' fee statement was not transmitted as part of the record, she did not participate in this appeal.

22.

### C. The Trial Court's Orders

**{¶ 43}** The trial court issued an order dated June 14, 2024 imposing financial sanctions for discovery violations against the State. It explained as follows:

> [W]hile the State has technically provided terabytes of discovery material contained within millions of pages of documents to Defendants, such discovery material has never been provided in a manner that is *practically useful* to Defendants. Beginning with the first discovery pre-trial in this matter, Defendants have notified the Court—and the Court has repeatedly addressed with the State—their inability to efficiently search the discovery files for content in a meaningful way which affords Defendants a meaningful opportunity to prepare for trial and protects their Constitutional rights. Notably, while voluminous e-discovery is not uncommon in civil litigation or in federal criminal litigation, there are myriad additional constraints when such voluminous discovery is provided in the context of Ohio's six-month timeline for trying criminal cases. Ohio Sup. R. 39(B)(1).

(Emphasis in original.) Although it found "the State ha[d] failed to produce discovery in a meaningful way and thus had failed to discharge its Rule 16 discovery obligations," the trial court determined that the State had not acted in bad faith and therefore the least-restrictive sanction was to order the State to pay appellees' attorney fees, not to exceed $20,000 per appellee.

**{¶ 44}** On June 17, 2024, the trial court issued a second order granting the State's motion to dismiss the indictment pursuant to Crim.R. 48(A). The court found that the State's difficulty in producing discovery in a "meaningfully useful fashion" constituted good cause, explaining that its prior order imposing discovery sanctions against the State eliminated any concern that the State sought dismissal of the indictment to avoid discovery sanctions.

23.

**D. Notices of Appeal**

{¶ 45} The State, with leave of this court, filed a notice of appeal of the June 14, 2024 order imposing sanctions. Miller, Konerman, Salon, and DelVerne filed briefs in response to the State's merit brief. DelVerne and Salon each filed a notice of cross-appeal, and DelVerne and Salon filed briefs responding to the State's merit brief and asserting assignments of error in connection with their cross-appeals.

## II. Assignments of Error

{¶ 46} In its appeal, the State asserts the following assignments of error:

1. The trial court erred as a matter of law when it held that the State's discovery disclosures did not satisfy Crim.R. 16.

2. Because the State produced three copies of discovery and satisfied Crim.R. 16, [it] is an abuse of discretion to financially sanction the state for technical difficulties encountered by the fourth copy of discovery.

3. When the State sought to resolve technical difficulties but the defense refused to engage with the technical support process, it is an abuse of discretion to sanction the State for those technical difficulties.

4. Because the State did not violate any discovery order, no sanction was warranted; alternatively, an aggregate financial sanction of $156,225.00 was not the least severe sanction available.

In his cross-appeal, DelVerne asserts a single assignment of error:

1. The Trial Court granted the State's Motion to Dismiss the case but when it permitted refiling, it placed Defendant at such a substantial disadvantage that to proceed further would be inconsistent with due process of law.

Finally, in his cross-appeal, Salon asserts the following assignments of error:

1. The Trial Court abused its discretion by not awarding Mr. Salon the full amount of his expenditures incurred by him because of the State's

malfeasance in failing to provide discovery in accord with Crim.R. 16 or the Court's many discovery Orders.

2. The Trial Court abused its discretion by not dismissing the case against Mr. Salon with prejudice.

## III. Law and Analysis

{¶ 47} In its first assignment of error, the State argues that the trial court committed an error of law in finding that the State violated Crim.R. 16. The State contends that it had no obligation under Crim.R. 16 to provide appellees with access to Relativity or any other document review platform. The State points out that Crim.R. 16 imposes an obligation for the State to produce discovery, but it does not require the State to produce discovery in a certain manner, and the State maintains that appellees could have uploaded the data on the hard drives to Relativity or another discovery platform themselves. Moreover, while Crim.R. 16(L) grants trial courts broad discretion to issue discovery orders not inconsistent with the rule, the State maintains that the trial court never actually issued any orders directing the State to provide appellees with access to Relativity and therefore it did not violate any of the trial court's discovery orders.

{¶ 48} In response, Miller argues that the State not only failed to comply with Crim.R. 16, but that Miller's due process rights were violated because the State produced the documents in such a way that Miller could not identify exculpatory material. Miller maintains that the trial court's October 11, 2023 order, which set training dates and required the State to finalize financial details regarding the platform, constituted an order to the State to produce the discovery in a document review platform.

25.

**{¶ 49}** Although discovery sanctions are typically reviewed for an abuse of discretion, an alleged error of law is reviewed de novo. "No court—not a trial court, not an appellate court, nor even a supreme court—has the authority, within its discretion, to commit an error of law." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38, quoting *State v. Boles*, 2010-Ohio-278, ¶ 26 (2nd Dist.). Because the State's first assignment of error alleges that the trial court incorrectly interpreted Crim.R. 16, the State's first assignment of error involves an issue of law, and it must be reviewed de novo. *See State v. Nguyen*, 2004-Ohio-2879, ¶ 21 (6th Dist.) (explaining that trial court's order allegedly misinterpreting the scope of Crim.R. 16 was subject to de novo review).

### A. Crim.R. 16 does not require the State to produce discovery in a particular format.

**{¶ 50}** "The philosophy of the Criminal Rules is to remove the element of gamesmanship from a trial." *State v. Howard*, 56 Ohio St.2d 328, 333 (1978). "The discovery rules are intended to 'prevent surprise and the secreting of evidence favorable to one party ... [and] to produce a fair trial.'" *State v. Lathan*, 2024-Ohio-2514, ¶ 68 (6th Dist.), quoting *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987). Specifically, Crim.R. 16(B) provides as follows:

> Upon receipt of a written demand for discovery by the defendant, … the prosecuting attorney *shall provide copies or photographs, or permit counsel for the defendant to copy or photograph*, the following items related to the particular case indictment…. and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, within the possession of, or reasonably available to the state, subject to the provisions of this rule:
> …

26.

(5) Any evidence favorable to the defendant and material to guilt or punishment;

{¶ 51} Unlike the Civil Rules governing discovery, Crim.R. 16 does not contain any provisions specific to the production of electronically stored information. *See* Civ.R. 34(B)(3) (stating that electronically stored information must be provided in a "form that is reasonably useable"). Instead, Crim.R. 16 merely states that the State "shall provide copies or photographs, or permit counsel for the defendant to copy or photograph" the discovery without regard to the source of the discovery. Crim.R. 16(B).

{¶ 52} Ohio case law on electronic discovery in criminal matters is quite limited, but Ohio courts may look to federal cases concerning Crim.R. 16(B)'s federal counterpart, Rule 16(a)(1) of the Federal Rules of Criminal Procedure, for guidance. *State v. Rivas*, 2009-Ohio-1354, ¶ 13 (considering federal case law on criminal discovery to assist in interpreting the Ohio Criminal Rules because "Rule 16(a)(1)(E) of the current Federal Rules of Criminal Procedure … is analogous to Crim.R. 16(B)(1)(c)"). Crim.R. 16's federal counterpart also lacks specific provisions governing the production of electronically stored information, instead providing similarly to Ohio's version of the rule that "the government must permit the defendant *to inspect and to copy or photograph*" discovery. (Emphasis added). Fed.R.Crim.P. 16(a)(1)(E).

{¶ 53} The central issue in this case is the trial court's interpretation that Crim.R. 16 requires the State to provide discovery that is searchable for content and uploaded to a document review platform in order for the discovery to be "useable." The trial court's conclusion is consistent with appellees' argument throughout the proceedings that the

27.

discovery must be processed for OCR and uploaded to Relativity. Notably, appellees' focus below was not on the universe of inculpatory evidence relied upon by the state, but on whether any exculpatory evidence might exist in the other universe of the millions of pages of documents.

{¶ 54} In general, federal courts interpreting Rule 16 of the Federal Rules of Criminal Procedure have almost uniformly held that the rule does not require the government to produce discovery in a particular manner. In *United States v. Warshak*, 631 F.3d 266, 296 (6th Cir. 2010), the Sixth Circuit noted that "Federal Rule of Criminal Procedure 16, which governs discovery in criminal cases, is entirely silent on the issue of the form that discovery must take; it contains no indication that documents must be organized or indexed." More specifically, in *United States v. Meredith*, 2015 WL 5570033, *2 (W.D.Ky. Sept. 22, 2015), the district court explained that "[t]he Government is under no obligation to provide discovery that is searchable by a particular application or in a specific fashion favored by a party." *See also United States v. Bailey*, 2022 WL 1261766, *2, 5 (N.D.Ohio Apr. 28, 2022) ("Criminal Rule 16 does not require the Government to enable Defendants to conduct sophisticated searches of the electronic discovery.").

{¶ 55} In one recent case, the defendant argued that the Government violated Rule 16 by failing to produce the documents in OCR format. *United States v. Yusuff*, 2024 WL 1055117, *2 (W.D.Tex. Mar. 11, 2024). The district court, explaining that "Rule 16 does not dictate a manner in which the Government must produce its document

28.

production," rejected the defendant's argument and held that the government had satisfied its obligations under Rule 16 by providing "three versions of the documents: (1) Relativity load-ready files, (2) PDF [B]ates stamped files alongside a searchable index of the documents, and (3) a production version of the native files." *Id*., citing *Warshak*, 631 F.3d at 296. The district court further found that the Government provided compelling reasons for why it did not OCR the documents—citing the time required, the additional size the process added to the files, and the usual lack of necessity for doing so—and noted that "there is nothing preventing counsel for [the defendant] from OCR-ing the files." *Id.*

{¶ 56} In addition to making the files searchable for content, appellees also argued that the State must host the files on a discovery review platform to be "useable." They further contended in the proceedings below that the State should be required to bear the cost of this platform. The State, on the other hand, took the position that providing load-ready files was sufficient under Crim.R. 16.

{¶ 57} Some federal courts have specifically considered whether the Government's production of load-ready files—that is, files that are processed for uploading onto the discovery review platform of the defense's choice—satisfies the Government's discovery obligations, and those courts have concluded that it does. *See, e.g., United States v. Spivak*, 639 F.Supp.3d 773, 776 (N.D.Ohio 2022) (holding that the Government was required to produce load-ready files for all electronic discovery under Rule 16); *United States v. Herrera-Velutini*, 2025 WL 791172, *3 (D.P.R. Mar. 12,

29.

2025).  Indeed, producing discovery in this way appears to be a fairly common practice in federal courts.  *See, e.g., United States v. Cooper*, 2018 WL 1916983, *9 (N.D.Tex. Apr. 2, 2018) (noting that "[t]o assist the defendants, the government agreed to reproduce all of the previously produced discovery with Bates labels and [an e-discovery platform] load file"); *United States v. Morgan*, 493 F.Supp.3d 171, 203 (W.D.N.Y. 2020) (discussing Government's production of discovery with load files); *United States v. Ellis*, 2020 WL 3962288, *2 (D.N.J. July 13, 2020) (finding no *Brady* violation because the government provided, among other things, "electronic records in a searchable format, such as PDFs, or in files that are loadable into a discovery platform").

{¶ 58} In a recent case before the U.S. District Court for Northern District of Ohio, the court discussed the commonplace practice of producing documents in a load-ready format.  *United States v. Spivak*, 639 F.Supp.3d 773, 776 (N.D.Ohio 2022).  In that case, the Government agreed to provide "the electronic discovery with metadata intact in a format that defense counsel could load onto a discovery review platform that would facilitate their review and preparation for trial, as opposed to providing the data in a static format, such as PDF files, that would require further processing, review, or analysis at great cost over additional weeks or months for meaningful review."  *Id*.  However, the Government failed to produce one segment of the discovery in a load file, instead producing that data in a folder containing 421,000 files that were images without metadata, which meant that defense counsel would have to review each image one by one, "a laborious and time-consuming endeavor."  *Id*.  Though the district court

30.

expressly declined to apply the rules governing discovery in civil cases, the court noted that producing electronically stored information in a load-ready format was "not unreasonable and more or less commonplace in comparable civil litigation today." *Id*. at 779-80. According to that court, therefore, producing electronic discovery in a format that could be loaded onto a discovery review platform discharged the Government's obligations under Rule 16. *Id*.

{¶ 59} Appellees contend that the files were not "upload-ready" because even when they were uploaded to Relativity, they were still not searchable and had to be reprocessed. As Lang testified, however, the hard drives produced to appellees were in a format that could be loaded onto an electronic discovery platform of the defense counsel's choosing. In addition, the record from the July 18, 2023 pretrial reflects that the State informed appellees that the data had been processed for uploading on a discovery platform early in the case. Nevertheless, there is no evidence that in the subsequent nine months any of the appellees ever attempted to load the data on a discovery platform. This is despite the fact that Konerman's firm had extensive experience in hosting and administering Relativity productions with its own in-house expert, Nancy Rathbun's counsel asserted that he had access to a review platform and other discovery software, and Miller's counsel talked about her prior experience with Relativity, with "higher-ups" at Miller's firm having "never in the history of criminal litigation" heard of a defendant requesting the State to pay for a platform and characterizing such a request as "wild." Consequently, because appellees never

attempted to load the data, appellees cannot now refute the State's assertions that the hard drive data was ready to be uploaded.

{¶ 60} Furthermore, although the documents in the SNWC Production may have needed processing for OCR before being loaded onto Relativity to be searchable, appellees had the capability to engage someone to do so. As discussed above, federal courts considering this issue have held that the Government is under no obligation to process documents for OCR prior to producing them. Moreover, testimony from the State's vendor indicates that the data was provided to appellees in the same format that the State itself uploaded to its own document review platform.

{¶ 61} As to who should pay for the discovery platform, the State argues that, under the American Rule, a non-indigent criminal defendant is obligated to pay for his or her own defense. For example, a non-indigent criminal defendant is not entitled to funds from the State to pay for an expert, even if the expert is necessary for an effective defense. *State v. Duhamel*, 2015-Ohio-3145, ¶ 44 (8th Dist.) (explaining that "without a finding of indigency, [the defendant] was not entitled to any state funds" for an expert witness). This court agrees that it would be contrary to the American Rule to require the State to pay for an e-discovery platform, even if it is necessary for an effective defense, for a non-indigent defendant. Nothing in Crim.R. 16 compels a different result.

{¶ 62} In addition, the trial court never made a finding of indigency for any of the appellees that would require the State to pay for costs associated with their defense. DelVerne argues in his appellee/cross-appellant brief that "[i]t was contended in the [trial

32.

court] and not challenged by the State that [DelVerne] is impoverished." DelVerne appears to refer to an April 29, 2024 affidavit in which he alleged that all of his significant assets had been taken from him because he personally guaranteed a loan to Northwest Capital, and since October 2022 his bank accounts had been closed, he and his family had been living in his mother-in-law's basement, he only had been earning "nominal" income from hourly jobs like painting, and his mother-in-law was paying for his attorneys' fees. The affidavit did not specify the amount of the "nominal" income DelVerne earned, nor did it provide any information whatsoever about DelVerne's spouse's income or DelVerne's monthly expenses. To be entitled to appointed counsel, DelVerne was required to establish that either his monthly income fell below a certain threshold amount or that after deducting his monthly expenses his income fell below a certain level, and he had to be determined indigent. *See* Admin.Code 120-1-03; R.C. 120.05. Because DelVerne's affidavit did not meet the standard for an affidavit of indigency and no finding was ever made that he was, in fact, indigent, he cannot now allege that the State was required to pay for any costs necessary for his defense.

{¶ 63} In sum, the trial court's order found that the State violated Crim.R. 16 by failing to produce discovery in a "meaningfully useful manner." The implication of the trial court's order is that the only way for the State to produce the discovery in a "meaningfully useful manner" was to provide appellees access to content-searchable files on a discovery review platform. The trial court's order, however, does not cite any case law supporting that proposition, nor have appellees identified any legal authority that

33.

states that Crim.R. 16 requires the State to pay for such a platform where electronic discovery is voluminous. Instead, Crim.R. 16 is silent as to the format of discovery productions other than requiring the State to "provide copies or photographs."

{¶ 64} As discussed above, federal case law interpreting an analogous rule demonstrates that there is no requirement for the government to produce discovery in a particular format under the federal rules. This court holds that the same reasoning applies to Crim.R. 16, which contains nearly identical language regarding the State's obligation to produce "copies and photographs." Crim.R. 16 does not require the State to produce voluminous electronic discovery in an OCR format uploaded to a discovery review platform.

{¶ 65} Furthermore, the State's discovery in this case satisfied its obligation under Crim.R. 16. The State produced hard drives containing the investigative files of the Division including the file trees. The files were formatted to be loaded onto a discovery review platform and were organized in the same way that the State possessed them and used them to build its case. The State also produced hard drives containing the same files with Bates-stamped numbers. It provided searchable indexes. It provided the exhibits presented to the grand jury. It also provided linked indexes to the list of exhibits that it planned to introduce for each count. Lastly, it provided access to the physical boxes of documents.

{¶ 66} As a final matter, the trial court's reliance on Sup.R. 39(B)(2), which states that a common pleas court must try a criminal case within six months, to distinguish

34.

federal criminal cases is misplaced. "The Rules of Superintendence provide important guidelines for ensuring the expeditious resolution of cases in the trial courts." *State ex rel. Culgan v. Collier*, 2013-Ohio-1762, ¶ 8. However, they "'are only internal housekeeping rules that do not create substantive rights in individuals or procedural law, and they do not have the force of law.'" *State v. Sheets*, 2025-Ohio-355, ¶ 19 (10th Dist.), quoting *Aaron v. Supreme Court*, 2024-Ohio-5616, ¶ 20 (10th Dist.), quoting *In re S.S.*, 2018-Ohio-1249, ¶ 11 (10th Dist). Because the Rules of Superintendence "do not function as rules of practice and procedure," they therefore do not require trial courts to dismiss criminal cases once they reach the six-month mark under Sup.R. 39(B)(2). *State v. Huffman*, 2010-Ohio-5113, ¶ 16, n. 1 (8th Dist.); *see also State v. Jackson*, 2022-Ohio-1522, ¶ 35 (2nd Dist.). Indeed, that timeline would be impossible to meet in a case with complex, voluminous discovery. As Konerman's own expert witness testified, even with access to a fully searchable Relativity database with all of appellees' preferred features, appellees would have needed six to nine months just to review the documents. Accordingly, the six-month timeline cannot serve as a basis for the trial court to interpret Crim.R. 16 as imposing additional discovery obligations beyond the rule's plain language.

{¶ 67} Accordingly, the trial court erred when it held that Crim.R. 16 required the State to provide appellees with access to a document management review platform and files that were searchable by content.

35.

**B. The State's production substantially conformed with its agreement.**

{¶ 68} Even though Crim.R. 16 does not require the State to produce discovery in a particular format, the parties can agree that the State will provide discovery beyond the obligations imposed by the rule. *See United States v. O'Brien*, 2022 WL 17487992, *1 (M.D.Fla. Dec. 7, 2022) (noting that "the Government has agreed to provide Defendants with limited access to its Relativity platform"); *F.D.I.C. v. McCaffree*, 289 F.R.D. 331, 334–35 (D.Kan. 2012) (noting that the parties had "agree[d] to utilize Relativity and split[] the cost … for maintaining Relativity").

{¶ 69} At least one federal court has held that when the Government enters into a discovery agreement, the Government may be compelled to fulfill its obligations under that agreement. *See United States v. Shabudin*, 2014 WL 1379717, *4 (N.D.Cal. Apr. 8, 2014). In *Shabudin*, the Government voluntarily agreed to maintain a Relativity database for two years, negotiating terms and conditions of that agreement with the defendants. *Id*. at *1. As part of the terms and conditions, the Government committed $1.8 million to maintain the database, including project manager services, for two years, though a specific end date was not part of the terms and conditions. *Id*. at *1, 3. The defendants spent a significant period of time reviewing and marking documents using the database, only to later discover that the Government failed to upload all of its productions to the database. *Id*. at *1. At a hearing on a motion to compel, the Government agreed to upload the remaining productions to the database, but the Government later told the defendants that the time period for the database would expire six months before trial and

36.

the addition of the extra uploads resulted in the elimination of the project manager services. *Id*. at *2-3. The defendants again filed a motion to compel, arguing that the Government failed to meet its obligations under the agreement, and the trial court agreed, ordering the Government to provide access to the database through trial with the services listed in the terms and conditions. *Id*. at *4.

{¶ 70} Here, although it had no obligation to do so under Crim.R. 16, the record demonstrates that the State entered into an agreement with appellees to provide them with access to Relativity. Pursuant to that agreement, the State committed $52,100 for appellees to have access to Relativity for three months with different user accounts for each of appellee's counsel, two trainings for appellees' counsel, and a single point of contact for technical support, beginning in January 2023. The terms of the discovery agreement were discussed on the record at pretrials in September and October 2023, though there is nothing in the record to indicate that the parties put the agreement into writing. And although the trial court never actually ordered the State to provide access to a discovery platform, the trial court's October 11, 2023 order incorporates at least some of the terms of the parties' discovery agreement, including that the discovery would be made accessible and training complete by January 8, 2023.

{¶ 71} Appellees argue that they relied on the State's assurances that the documents had been properly uploaded into Relativity and that it was fully functional, resulting in a waste of their counsels' time in attempting to perform searches on Relativity and a prejudice to appellees.

37.

{¶ 72} As a preliminary manner, many of appellees' complaints regarding the quality of the State's production concern issues outside of the parties' agreement. The record does not reflect that the State committed to provide, nor did appellees even request, a certain version of Relativity. Likewise, there is nothing in the record to indicate the State agreed to provide any particular Relativity features or to use a particular vendor to host Relativity. The record merely reflects that the State committed to paying approximately $52,000 for eight users to have access to Relativity for three months. Further, as evidenced by the experts who testified at the April 2024 hearing as well as statements made by counsel, at least some of appellees' counsel were quite familiar with Relativity through prior experience with the platform and at least one counsel had a Relativity expert working for his law firm. They were sufficiently experienced to communicate any particular expectations as to Relativity, and if they were not, they should have retained someone with that expertise. *See* Department of Justice and Administrative Office of the U.S. Courts Joint Working Group on Electronic Technology in the Criminal Justice System, *Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases*, https://www.uscourts.gov/file/finalesiprotocolbookmarkedpdf (accessed December 22, 2025) ("ESI Protocol") ("[F]or complex ESI productions, each party should involve individuals with sufficient technical knowledge and experience to understand, communicate about, and plan for the orderly exchange of ESI discovery.").

38.

**{¶ 73}** As to the searchability of the documents, appellees did not get the benefit of their bargain to the extent that the documents were not reliably searchable. However, the documents' searchability was due to a technical error, not the State's refusal to make those documents searchable. Federal courts have noted that technical difficulties are not uncommon in cases with voluminous electronic discovery. *See United States v. Satary*, 2020 WL 5850163, *8 (E.D.La. Oct. 1, 2020) ("The Court is not in the least bit surprised that the Government and Defendant have run into some technical difficulties. That is to be expected given the [sheer] magnitude and complexity of a case like this which is ESI extensive."). Technical issues do not mean a discovery violation has occurred unless the State was informed of the issues and failed to appropriately investigate and resolve the issues after learning of them. *See United States v. Maloney*, 102 F.4th 904, 916 (8th Cir. 2024) (holding that discovery sanctions were inappropriate despite technical difficulties preventing defendant from reviewing key evidence for a period of four months because the Government resolved those issues two months after learning of them); *Satary*, 2020 WL 5850163 at *8 (finding that discovery sanctions were not appropriate for technical issues where the Government addressed them and for technical issues not raised to the Government). The ESI Protocol acknowledges the likelihood of technical problems in ESI discovery in its statement regarding resolution of disputes regarding ESI discovery that "[i]f resolution of the dispute requires technical knowledge, the parties should involve individuals with sufficient knowledge to understand the technical issues [and] clearly communicate the problem(s) leading to the dispute…."

39.

{¶ 74} Here, the State maintains that any delay in resolving the technical issues was due to appellees' failure to provide sufficient details about which documents were missing from the search results and real-time notice when searches were slow. The State points out that appellees failed to contact technical support and that even when McCleskey reached out to Loo, who was well-qualified to identify the problems, Loo only provided general information. Lang testified that before March, he was unaware that all of the omitted documents came from the SNWC Production. That information would have presumably assisted the State's vendors in determining earlier that the production, which originated as hard-copy documents and therefore needed additional processing than the State's other productions, had not been properly processed. And even appellee's Relativity expert, Bargy, testified that she was best equipped to troubleshoot problems when she was given sufficient detail about the problem to replicate it. Nonetheless, several counsel for appellees asserted that they should not have to contact technical support to assist the State in resolving any technical issues.

{¶ 75} Moreover, once the State understood that the unreliable searches were not merely caused by the limitations of OCR technology, it reprocessed the SNWC Production and reloaded it into Relativity approximately a week later. In addition, at the April 29 hearing, appellees provided much more specific information about issues that persisted following the reprocessing of the SNWC Production, and immediately following that hearing, the State moved to dismiss the indictment under Crim.R. 48 and asserted that it would have a significantly increased budget for producing discovery for

40.

any reindictments. The State did not simply ignore the technical issues or try to maintain the case regardless of those issues. As the trial court found, the State did not act in bad faith. Instead, the State addressed technical issues within a timely manner once it had sufficient information about the problem to address the cause. Therefore, the trial court abused its discretion in concluding that the State committed a discovery violation for failing to address technical issues with the discovery platform provided to appellees pursuant to an agreement between the parties.

## C. The Due Process Clause does not require the State to produce discovery in a particular format.

{¶ 76} Appellees also assert that, in addition to violating Crim.R. 16, the State's discovery productions violated their rights under the Due Process Clause. They contend that absent the State's provision of the means to reliably search the millions of documents, they could not identify exculpatory material.

{¶ 77} "'There is no general constitutional right to discovery in a criminal case….'" *State v. Blair*, 2024-Ohio-1061, ¶ 18 (8th Dist.), quoting *State v. Marshall*, 2021-Ohio-816, ¶ 23 (1st Dist.), quoting *State v. Hale*, 2008-Ohio-3426, ¶ 120. However, "[I]n *Brady* [*v. Maryland*, 373 U.S. 83 (1963)], the Supreme Court of the United States held that a state violates the Fourteenth Amendment to the United States Constitution when it 'withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment.'" *State v. Bethel*, 2022-Ohio-783, ¶ 19, quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012) (summarizing *Brady*'s holding). "There are three components of a true [*Brady*] violation: The evidence at issue must be favorable to the

41.

accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id*. "[W]here the State discloses exculpatory evidence before … trial and the trial court provides opportunities for the accused to use the exculpatory material during trial, there is no prejudice." *State v. Thomas*, 2025-Ohio-1343, ¶ 37 (1st Dist.), quoting *State v. Jones*, 2019-Ohio-4862, ¶ 60 (1st Dist.), citing *State v. Aldridge*, 120 Ohio App.3d 122, 146 (2d Dist. 1997). Accordingly, to establish a *Brady* violation, appellees must establish that they did not have access to potentially exculpatory material during trial. Here, no trial occurred because the trial court dismissed the indictment before trial, and therefore appellees cannot establish a *Brady* violation occurred.

{¶ 78} Because the State did not commit a discovery violation, either under Crim.R. 16 or pursuant to the parties' discovery agreement, nor did the State violate appellees' due process rights, the State's first assignment of error is found well-taken. Having found that no discovery violation occurred, the State's remaining assignments of error are moot. Similarly, the assignments of error asserted by DelVerne and Salon's in their respective cross-appeals, which challenged the sanction imposed by the trial court for the discovery violation, are moot.

42.

## IV. Conclusion

**{¶ 79}** Based on the foregoing, the judgment of the Lucas County Common Pleas is reversed and the trial court's order imposing financial sanctions against the State is vacated. Appellees are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed and vacated.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                    _____
                                                        JUDGE

Christine E. Mayle, J.

Charles E. Sulek, P.J.                  _____
CONCUR.                                              JUDGE

                                        _____
                                                        JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.